**In re Timothy KRAMER, Debtor.**

**CENTRAL BANK, Plaintiff,**

**v.**

**Timothy K. KRAMER, Defendant.**

**Bankruptcy No. 583–00384–S.
Adv. No. 583–0161.**

United States Bankruptcy Court,
W.D. Louisiana,
Shreveport Division.

Jan. 31, 1984.

Kent Breard, Jr., Monroe, La., for plaintiff.

William D. Hall, Shreveport, La., for defendant.

## FINDINGS OF FACT

LeROY SMALLENBERGER, Bankruptcy Judge.

The defendant entered into a contract to be bound by the terms and conditions of

the VISA cardholder agreement introduced into evidence. The agreement generally provides that the defendant could present his VISA cards to merchants and obtain credit, thereby enabling him to purchase goods or services without immediate payment to the merchant. The plaintiff agreed in the cardholder agreement to pay the merchant on defendant's behalf and bill the defendant on a monthly basis. The defendant agreed to make the necessary minimum payments to keep his account current and agreed not to make charges that would exceed his credit limit, which was $600.00. The defendant also agreed to pay interest on the account when due, to pay reasonable attorney's fees, expenses and costs incurred in the collection of the account.

The testimony of Mr. Jim Renfro, assistant cashier of plaintiff, and a review of the statements and charge tickets evidencing the defendant's account introduced by plaintiff into evidence, established the following: From the time the defendant obtained the VISA card, on February 24, 1981, through and until approximately February 17, 1983, the defendant maintained his account within the $600.00 credit limit, never purchasing more than $225.00 in merchandise for any one billing period, never making more than three charges per billing period, and almost always maintaining his account on a current status. Indeed, the defendant only utilized the VISA card a total of 8 times, to purchase a total of $456.00 worth of goods, during the entire period preceding February 17, 1983.

On or about February 18, 1983, the defendant began making numerous charges at an excessive rate. The defendant made a total of 100 charges within 4 to 6 weeks, which charges totalled $2,113.69. All but one or two of these charges were for amounts less than the floor limit of $50.00. Mr. Renfro defined the "floor limit" as the purchase limit generally permitted by merchants without obtaining special credit authorization approval. The majority of these purchases were incurred by the defendant in preparation for or while on vacation in California and/or Hawaii between the dates of February 22, 1983, and March 6, 1983. Many of these charges were for luxury, non-necessity type items, such as videotapes, film, watches, liquor store purchases, clothing purchases and restaurant expenditures.

After reviewing the transcript of the hearing, and particularly the defendants answers to the questions by the plaintiff's attorney, the Court finds that the defendant had discussed bankruptcy with his attorney prior to his Hawaiian vacation. The Court also finds that the defendant delivered to his attorney a schedule of his assets and liabilities prior to his Hawaiian vacation.

The foregoing charges were incurred by the defendant at a time when he was hopelessly insolvent, as evidence by his schedule of assets and liabilities. The defendant was unemployed and, with the exception of about three weeks, had been unemployed from August, 1982, through and until the date of the bankruptcy hearing, in August, 1983. The defendant admitted that he had no immediate prospects for employment, since his expertise was in the depressed oil and gas industry.

The Court finds that upon notice of the defendant's spending spree, the plaintiff took reasonable action to limit its exposure. The plaintiff immediately revoked the defendant's cardholder privileges by letter, dated February 23, 1983, and mailed to defendant's proper mailing address, which was received by the defendant's parents. The plaintiff also "hot listed" the card by placing it on the list of cards to be picked up by any merchant to whom the card was presented. Unfortunately, the spending spree occurred before the number of the card could be added to the list.

Under the terms and conditions of the cardholder agreement, the debtor was bound to pay monthly finance charges of 1.5% per month and all costs and expenses incurred by the plaintiff, including expressly but not exclusively reasonable attorney's fees. The plaintiff has submitted affidavits and other documentary evidence estab-

lishing that the plaintiff agreed to pay an hourly rate of $75.00 per hour for the services of its attorney in the matter, and that the said attorney would expend approximately $2,000.00 in time and charges on behalf of the said client at the said rate. The plaintiff also submitted documentation showing telephone expenses, witness fees and transcript costs totalling $127.94. Additionally, the plaintiff was obligated to pay various clearing banks across the country reproduction costs of $2.00 per charge ticket, which amounts to approximately $200.00.

The issue before the Court is whether the total of the principal, interest, attorney's fees and costs hereinabove set forth is a nondischargeable debt due plaintiff from the defendant, because the credit obtained by the defendant through the use of his VISA credit card in the weeks just prior to the filing of bankruptcy constitutes obtaining money, property, services or an extension of credit by false pretenses or false representations, as provided by 11 U.S.C. 523(a)(2)(A).

## CONCLUSIONS OF LAW

Various courts have interpreted 11 U.S.C. 523(a)(2)(A) and its predecessor, 11 U.S.C. 35(a) of the Bankruptcy Act, as the same relate to credit cards debts. The jurisprudence has consistently held that the creditor must prove the following in order to have its debt declared nondischargeable under this section:

"(1) The debtor obtained the property by means of representations which he knew were false or which were made with reckless disregard of their truthfulness;

(2) The debtor had an intent to deceive, which may be inferred from the knowing or reckless misrepresentation made to induce another to transfer property to the debtor; and

(3) The creditor actually and reasonably relied on the misrepresentation." *In Re Schnore*, 13 B.R. 249 (W.D.Wisc., 1981).

See also *Carini v. Matera*, 592 F.2d 378 (7th Cir., 1979); *In Re Smith*, 25 B.R. 396 (1982); *In Re Ratajczak*, 5 B.R. 583 (M.D. Fla., 1980).

The Court found that the defendant did enter into a contract whereby he agreed to be bound by the VISA cardholder agreement. The plaintiff does not seek to declare nondischargeable the balance of $102.54, which preexisted the spending spree beginning, on February 16, 1983, but seeks to hold the debtor nondischargeable only as to the $2,113.69 of charges incurred subsequent to that time. The Court finds that the plaintiff's reliance upon the defendants representations were actual, reasonable and detrimental.

■ False pretenses or fraudulent or reckless misrepresentations may be implied by the debtor's conduct or silence and numerous courts have consistently held that no overt misrepresentation is necessary to find a debt nondischargeable under 11 U.S.C. 523(a)(2)(A). As stated, in *In Re Schnore*, supra:

"The debtor's presentment of his or her credit card and signature on the credit receipt in exchange for goods is deemed an implied representation that the debtor has the intent and ability to pay for the goods. This implied representation makes overt statements of intent and solvency unnecessary."

See also *In Re Black*, 373 F.Supp. 105, 107 (E.D.Wisc., 1974); *In Re Bauasiak*, 3 Bkr. L.Rep. (CCH), Section 67,767 (M.D.Fla., 1981); *In Re Schnider*, 3 B.C.D. 175 (D.Nev., 1977).

The plaintiff will have met the burden of proving a false misrepresentation by the defendant, if it can show that the defendant purchased goods by means of the credit card and that the purchases were made at a time when the debtor either did not have the means to or did not have the intent to pay for the goods. *In Re Schnore*, supra. As stated in the "Findings of Facts" the Court found that the defendant had discussed bankruptcy with his attorney prior to his Hawaiian vacation. The Court also found that the defendant delivered to his

attorney a schedule of his assets and liabilities prior to his Hawaiian vacation. The defendant had been almost constantly unemployed for a period in excess of six months, with no immediate prospects for employment in the depressed oil and gas industry. These facts establish both the defendant's inability to pay and also constitute overt actions by the defendant which establish his intent not to pay.

These facts also establish the second element of required proof under 11 U.S.C. 523(a)(2)(A), that the defendant had an intent to deceive. The problem of proof is discussed by Bankruptcy Judge C.H. Goetz in a similar situation as follows:

"Credit card fits into this classic mold. The presumed presentation of the credit card and the signature on the credit card receipt constitutes a promise that the credit cardholder will, at some future time, pay the obligation incurred. The credit is extended in reliance on that promise, as the holder of the credit card intends. If it can be established that, in fact, at the time the debt was incurred, there was no intent to pay, then all the elements of fraud are present.

Since, obviously, few men will admit to a fraudulent intent, such intent must be established by circumstantial evidence. If all the facts are inconsistent with the intent to repay, the use of the credit card is fraudulent. While certain fact patterns tend to recur, the question of intent is an issue of fact to be decided with relationship to the facts of the particular case before the court." *In Re Pannell,* Bankruptcy—E.D. NY, Adv. No. 182–0282–21, 1/25/83.

■ In order to establish by circumstantial evidence the fraudulent intent, courts have looked to certain criteria to evidence such. These criteria include the following: (1) the length of time between making the charges and filing bankruptcy; (2) the number of charges made; (3) the amount of the charges; (4) whether the charges were above the credit limit on the account; (5) a sharp change in the buying habits of the debtor; (6) whether charges were made in multiples of three or four per day; (7) whether charges were less than the $50.00 floor limit; (8) the financial condition of the debtor was hopelessly insolvent when the charges were made; (9) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (10) the debtor's employment circumstances; and (11) the debtor's prospects for employment. See *In Re Pannell,* supra; *In Re Stewart,* 7 B.R. 551 (B.C. M.D., Ga., 1980); *In Re Boydston;* 520 F.2d 1098 (5th Cir., 1975); *In Re Hadley,* 25 B.R. 713 (M.D.Fla.1982); *In Re Smith,* 25 B.R. 396 (D.Md., 1983); *In Re Black,* supra; *In Re D'Amico,* 1 B.R. 170 (W.D. NY, 1979); *In Re Schnore,* supra; *In Re Potete,* 13 B.R. 565 (B.C.N.D. TX, 1981); *In Re Petriui,* Adv. No. 82–14006, (B.C.E.D. Pa., 1982); *In Re Scheider,* supra.

■ In this case the defendant met with his attorney and discussed bankruptcy on or about February 16, 1983, prior to his departure to Hawaii for a vacation on February 22, 1983. Then before his departure to Hawaii, the defendant delivered a schedule of his assets and liabilities to his attorney.

In the two year existence of the account prior to February 16, 1983, only 8 charges, totaling $456, had been made on the account. The account never exceeded its credit line and was almost always current. After February 16, 1983, almost 100 charges, of which all but one or two of these charges were below the $50.00 floor limit, were incurred in less than a month. These charges totalled $2,113.69, greatly in excess of defendant's admitted credit limit of $600.00, and included numerous luxury items, such as videotapes, films, watches, restaurant and liquor store purchases. Also the defendant testified, the majority of the charges were incurred on a Hawaiian vacation which lasted about two weeks.

As can be seen from the defendant's bankruptcy schedules, the defendant was insolvent prior to his spending spree with his VISA credit card. The defendant's liabilities of approximately $14,000 exceeded his (nonliquid) assets of $500.00, and this

schedule of liabilities does not include the $2,113.69 debt to the plaintiff in his liabilities. The defendant argues he was not "hopelessly insolvent". The defendant argues that he could pay his debt because he believed that he was due $4,000 from the sale of a video arcade. The defendant's contention was rebutted by the instrument of sale, in which the defendant acknowledged receipt of $4,000 that the defendant contended was still due to him. Also, the defendant's purchasing partner stated that the funds were not due to the defendant. However, even if the defendant prevailed in this argument his liabilities still greatly exceeded his liabilities by far more than $4,000.

The Court finds that each and every one of the 12 factors that the courts have used to evidence fraudulent intent was present in this case. Therefore, the Court finds that the defendant did not intend to pay for the purchases that he made on his VISA credit card in the weeks prior to his filing a petition for relief in bankruptcy.

The plaintiff has properly established that the defendant is indebted unto the plaintiff on the defendant's VISA account with plaintiff in the principal amount of $2,113.69, and that this principal amount is nondischargeable under 11 U.S.C. 523(a)(2)(A). The plaintiff contends that the total indebtedness due from the defendant to the plaintiff includes contractually agreed upon interest, attorney's fees, expenses and costs. The Court found that the defendant entered into a contract in which he agreed to be bound by the cardholder agreement, which provides as follows:

"3. All indebtedness incurred through use of the Account plus all resulting costs and expenses incurred by Issuer including reasonable attorney's fees, other than unauthorized use, will, at Issuer's option, become immediately due and payable without notice, in the event that:

(a) Cardholder fails to make payments when due or credit exceeds Account Limit, or a breach or default of this Agreement occurs;

(b) Issuer receives information which causes it to believe cardholder is unwilling or unable to perform under these terms and conditions."

The plaintiff established that it agreed to pay attorney's fees in the case at bar, at an hourly rate of $75.00 per hour. The plaintiff's attorney's affidavit establishes that the total charge to the plaintiff at this hourly rate is $2,000.00. The plaintiff also established additional charges and expenses totalling $127.00, and costs of reproducing charge tickets actually paid to other VISA credit centers across the country of $2.00 per ticket, or approximately $200.00.

The Court considers the plaintiff's costs and expenses including attorney fees were all necessary as a result of the defendant's misrepresentations. The Court also concludes that the amount of costs and expenses and attorney's fees could have been averted by the defendant's admission that the debt was indeed nondischargeable, as proved by the plaintiff in these proceedings.

Therefore, this Court holds that the entire indebtedness of $2,113.69, with 1.5% per month interest from April 14, 1983, (in accordance with the cardholder agreement), together with reasonable attorney's fees of $2,000.00 and actual expenses of $327.00 is due by the defendant to the plaintiff, and that the same is nondischargeable under 11 U.S.C. 523(a)(2)(A).