**In the Matter of Larry Randy STEWART, Marjorie Jean Stewart, Debtors.**

**NORWEST BANK DES MOINES, N.A. CARD SERVICES DIVISION, Plaintiff,**

**v.**

**Larry Randy STEWART, Marjorie Jean Stewart, Defendants.**

**Bankruptcy No. 86–2174–C J. Adv. No. 86–0281.**

United States Bankruptcy Court, S.D. Iowa.

Sept. 26, 1988.

Robert A. Wright, Sr., Des Moines, Iowa, for debtors.

Donald F. Neiman, Des Moines, Iowa, Chapter 7 Trustee.

Gregory W. Peterson, Des Moines, Iowa, for Norwest Bank Des Moines, N.A. Card Services Div.

## MEMORANDUM OF DECISION

LEE M. JACKWIG, Chief Judge.

The matter before the court is the plaintiff's June 17, 1988 motion to amend and enlarge finding pursuant to Bankruptcy Rule 7052. The plaintiff asks the court to amend its June 16, 1988 order finding the debt in issue dischargeable and awarding attorney fees pursuant to 11 U.S.C. section 523(d). Also under consideration at this time is the claim for attorney fees filed by the defendants' attorney on July 14, 1988.

This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(I). Based on the

record in the above captioned adversary proceeding, the court enters the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

1. On July 14, 1983 Larry Randy Stewart and Marjorie Jean Stewart (Stewarts), the Chapter 7 debtors and defendants in this case, applied for a credit card from Norwest Bank Des Moines, N.A. Card Services Division (Norwest), the plaintiff.

2. According to Mr. Stewart, Norwest granted an initial line of credit of $1,000.00.

3. Norwest presented no evidence of the Stewarts' credit history from July of 1983 to March of 1986.

4. Mr. Stewart testified that if he was behind on any payments, he always caught up the next month. He observed that Norwest kept sending him letters praising his good payment history and raising his credit limit.

5. Exhibit 1, consisting of 5 monthly statements from the Stewarts' account, reveals the following:

   a. At least as of April 16, 1986, the Stewarts' credit limit was $1,500.00. They made one charge of $6.90 on March 26, 1986 and one payment of $72.00 on April 15, 1986. The balance owing was $1,406.87, leaving available credit of $93.00.

   b. As of May 15, 1986, no additional charges and no payments had been made. The balance owing was $1,429.69, leaving available credit of $70.00. The statement reflects a past due notice (for the prior month's minimum payment of $70.00).

   c. As of June 16, 1986, no additional charges had been made. The Stewarts had made a payment of $141.00 on June 10, 1986. The balance owing was $1,311.17, leaving available credit of $188.00.

   d. The July 16, 1986 statement reflects a credit limit of $1,900.00—a $400.00 increase. The Stewarts took a cash advance of $180.00 on June 27 and made 3 charges totalling $113.57 on June 26 and 27. The balance owing was $1,628.23, leaving available credit of $271.00. The statement reflects a past due notice (for the prior month's minimum payment of $65.00).

   e. The August 15, 1986 statement reveals that the Stewarts took a cash advance of $265.00 on July 19 and made 12 charges totalling $403.76 on July 19 and 20. (The charges include: $46.97, $31.27 and $42.09 at Target on July 19; $34.73 and $45.66 at K–Mart on July 19; $28.42 at Target on July 20; and $40.48 at K–Mart on July 20.) The balance owing was $2,331.49. The statement reflects a past due notice and warning that the account may be closed.

6. The Stewarts denied that they made multiple charges at Target and K–Mart to avoid any call-in limit. They explained that they took their three children (ages 12, 13 and 14) to each store on separate trips to purchase clothing and school supplies. Other charges during that time period were for gas, cigarettes and garbage cans.

7. Mr. Stewart testified that the $265.00 withdrawal was for road expenses related to his trucking job and might also have been for bills. He also testified that the earlier $180.00 withdrawal was for road expenses and bills.

8. Mr. Stewart testified that he did not keep a record as purchases were made and did not keep track of the credit balance because the store usually called in the charges.

9. Mr. Stewart stated that he had intended to repay the obligations when he incurred them on July 19 and 20 of 1986. However, his wife's babysitting work diminished and he lost his job after the last payment.

10. On July 21, 1986 the Stewarts first consulted an attorney regarding filing a bankruptcy petition.

11. The Stewarts prepared the petition on July 28, 1986.

12. The petition and order for relief were filed August 7, 1986.

13. On October 31, 1986 Norwest filed a complaint to determine $793.30 in purchas-

es and cash advances nondischargeable pursuant to 11 U.S.C. section 523(a)(2)(A) and (C).

14. On December 3, 1986 the Stewarts filed their answer and requested costs pursuant to 11 U.S.C. section 523(d).

15. On January 8, 1987 Norwest filed a motion for summary judgment based in essence on the Stewarts' admission of key facts by failing to answer requests for admissions.

16. On April 3, 1987 the motion for summary judgment was denied but the Stewarts were warned that failure to admit the truth of any matter which Norwest subsequently proved would result in expenses being assessed against them.

17. On April 10, 1987 the Stewarts filed their responses to Norwest's request for admissions. They admitted their master card account number, that the copies of their monthly statements were accurate, that the balance was due and owing and that they incurred charges on Norwest's card totalling $793.30 within 40 days of the petition date. They denied that they intended not to pay Norwest when they used their card, that they purchased luxury goods and services, that the amount was nondischargeable, that they "loaded up" their card before filing for bankruptcy, that the charges made in July of 1986 were made when the card was over limit and that they made multiple charges to avoid the floor call-in limit.

18. On April 10, 1987 the Stewarts filed answers to Norwest's interrogatories. They indicated that they first consulted an attorney regarding filing a bankruptcy petition on July 21, 1986; that the bankruptcy petition was prepared on July 28, 1986; that the charges and withdrawals were for clothing, school supplies, gas, cigarettes, light fixtures, garbage cans and bills; that they did not know they were over limit in June and July of 1986 and their credit had been raised in July; that the $265.00 advance was used for bills and supplies; and that the multiple charges at Target and K–Mart reflected the separate trips with each child.

19. On March 24, 1988 the attorney for Norwest presented a stipulated scheduling order to the court at the time of the prehearing. The Stewarts' attorney did not appear.

20. According to both the stipulated scheduling order and the final pretrial order, the fact in dispute was whether the expenditures were for luxury goods and services. The issues included: 1) whether the Stewarts' use of the credit card constituted representation of intention and ability to repay the debt incurred; 2) whether Norwest relied on said representation; 3) whether the Stewarts had the ability to repay at the time the charges were made; and 4) whether the Stewarts intended to repay the obligations at the time they were incurred.

21. In its brief filed June 7, 1988, Norwest states that it "now seeks to have this debt [$793.30] declared nondischargeable by reason of 11 U.S.C. § 523(a)(2)(A), (C)". It argued that a credit card holder's use of the card represents both the ability and the intention to pay and that the credit card issuer relies upon those representations in extending credit. Norwest contended that the Stewarts' intent to deceive was evident from the relative inactivity from March of 1986 to June 26, 1986, from the number of charges on June 27 and 28 and on July 19 and 20, from the dollar amounts of the charges (below the $75.00 call-in limit), from their consultation with an attorney on July 21, 1986 and because they knew or should have known they were insolvent and unable to pay at the time they made the charges.

22. Ralph Hamilton, credit card recovery supervisor for Norwest, testified at the June 16, 1988 hearing that Norwest views the ongoing use of a credit card as a representation that the holder intends to repay the debt over a period of time and that Norwest relied on the Stewarts' representation. He clarified that the total charges between June 27 and July 20, 1986 amounted to $962.33, exclusive of any finance charges. (The court permitted Norwest to amend the pleadings to conform with the proof.) He also stated that the call-in

amount for retail department stores is $50.00, that it was difficult to say which transaction was the first to go over the Stewarts' credit limit, that he could not state exactly when the credit limit was increased and that he could not determine the nature of the purchases from Exhibit 1. Norwest's witness testified on cross-examination that he assumed the $265.00 cash advance on July 19, 1986 was not over the limit because otherwise the automatic teller machine would have rejected it.

23. The Stewarts' testimony essentially reflected the facts set forth in paragraphs 1 through 11 and was consistent with their responses and answers to Norwest's request for admissions and interrogatories.

24. At the close of the testimony the court questioned the merits of the action under section 523(a)(2)(C) because purchases must exceed $500.00 on or within forty days before the order for relief is entered and cash advances must aggregate more than $1,000.00 on or within twenty days. (According to the court's calculations only $493.78 in purchases were made within 40 days of the August 7, 1986 order for relief —that is, on or after June 28, 1986 and meaning the June 27, 1986 purchase was not part of the calculation. Likewise, only the $265.00 advance was obtained within 20 days of the order for relief—that is, on or after July 18, 1986.) Norwest's attorney responded that Norwest chose to proceed at trial only on subparagraph (A).

25. At the conclusion of the hearing, the court stated that the controversy was a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(I). The court concluded that the Stewarts did not intend to deceive Norwest, as required by 11 U.S.C. section 523(a)(2)(A), based on (1) the incomplete credit history provided by Norwest, (2) the Stewarts' efforts at making two minimum payments during the general time frame presented, (3) the far from excessive (in either dollar amount or nature) purchases and advances, (4) the Stewarts' credible explanation for the number of trips to Target and K–Mart and their apparent lack of knowledge with respect to the call-in limit, (5) the credit increase during the alleged period of fraud, and (6) the use of the credit card for a cash advance on July 19, 1986. Accordingly, the court found the $962.33 debt to Norwest dischargeable, and pursuant to 11 U.S.C. section 523(d), directed the Stewarts' attorney to prepare a statement regarding his fees.

26. On June 17, 1988 the plaintiff filed its motion to amend and enlarge findings, stating in part:

Plaintiff specifically moves the Court to address the issues listed below providing both the factual and legal basis for any determination made:

1. The Court's stated determination that obtaining a $265.00 cash advance on July 19, 1986 and draining Defendants [sic] available credit limit almost to the penny within 48 hours of consulting an attorney for the express purpose of filing a bankruptcy constitutes a showing of good faith by Defendants.

2. That making 5 overlimit purchases on the day before consulting an attorney for the express purpose of filing a bankruptcy, July 20, 1986 did not constitute a "load up" or substantially justify Plaintiff's pursuit of this non dischargability [sic] action.

3. That following 3 months of relative inactivity Defendants making 12 charges, the majority over limit, within 48 hours of consulting an attorney for the express purpose of filing a bankruptcy does not substantially justify Plaintiff pursuit of this non dischargability [sic] action.

4. That Defendants receiving a cash advance and draining all but $6.00 of available credit within 48 hours of consulting an attorney for the express purpose of filing a bankruptcy does not substantially justify Plaintiffs bringing this non dischargability [sic] action.

The Plaintiff moves that the Court set out with particularity those elements the Court deemed to be inadequately shown to afford Plaintiff recovery pursuant to 11 U.S.C. § 523(a)(2)(A) providing both

the factual legal basis for that conclusion.

In support of its Motion Plaintiff states that this further action by the Court is necessary to clarify the Court's bench ruling and that it will narrow and focus the issues for appeal.

27. On July 14, 1988 the Stewarts' attorney filed his claim for attorney fees in the amount of $1,480.00 for 14.8 hours of service rendered from September 26, 1986 through July 20, 1988.

28. On July 19, 1988 Norwest filed objections to the claim for attorney fees, contesting both the basis for such an award under 11 U.S.C. section 523(d) and the justification tion of the hours and services as set forth on the application.

## DISCUSSION

### I. The Nondischargeable Debt.

Up until the actual hearing, Norwest relied upon 11 U.S.C. section 523(a)(2)(A) and (C) for its complaint to determine $962.33 of the $2,331.49 balance nondischargeable. The relevant statutory language reads as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . .

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $500 for "luxury goods or services" incurred by an individual debtor on or within forty days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within twenty days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act (15 USC 1601 et seq.)

11 U.S.C. § 523(a)(2)(A) and (C). Subparagraph (C) was added to section 523(a)(2) by the Bankruptcy Amendments and Federal Judgeship Act of 1984. It creates a rebuttable presumption of nondischargeability. That is, the creditor need not establish all the elements of fraud by clear and convincing proof as is otherwise required by subparagraph (A). *Matter of Smith*, 54 B.R. 299 (Bankr.S.D.Iowa 1985).

Norwest can not establish that the Stewarts used its credit card to make purchases that exceeded $500.00 on or within forty days before the order for relief was entered or to obtain more than $1,000.00 in cash advances on or within twenty days. Accordingly, it does not benefit from the presumption of fraud under subparagraph (C). Norwest must prevail, if at all, under subparagraph (A).

In order to hold a credit card debt nondischargeable under subparagraph (A), the court must find that (1) the debtor knowingly made a false representation; (2) the debtor intended to deceive the creditor; and (3) the creditor relied upon the false representation. *Comerica Bank–Midwest v. Kouloumbris*, 69 B.R. 229, 230 (N.D.Ill. 1986); *In re Schmidt*, 36 B.R. 459, 460 (E.D.Mo.1983); and *Matter of Buford*, 25 B.R. 477, 481 (Bankr.S.D.N.Y.1982). The use of the credit card is an implied representation to the issuer that the holder has both the ability and the intention to pay for the purchases and the advances. *Comerica*, 69 B.R. at 230; *Schmidt*, 36 B.R. at 460; and *Buford*, 25 B.R. at 481. Intent to deceive may be inferred when the card holder knew or should have known that the card holder was insolvent and had no ability to pay. *Buford*, 25 B.R. at 481. *However*, insolvency alone does not establish

intent to deceive. *Schmidt*, 36 B.R. at 460. With respect to the element of reliance in a section 523(a)(2)(A) action, the creditor must prove reliance on the fraudulent representation in extending credit but need not prove that the reliance was reasonable. *In re Ophaug*, 827 F.2d 340, 342–43 (8th Cir. 1987).

As in most cases, the first and third elements are easily proved in this case. The Stewarts used their card on the dates shown on Exhibit 1. Norwest relied upon the use as a representation that the Stewarts could and would pay the debt.

It is the intent to deceive that is difficult to establish. Although intent may be inferred where the debtor knew or should have known that repayment of the debt was impossible, courts have recognized "that misconceived optimism is not uncommon to the financially distressed". *Buford*, 25 B.R. at 482. Accordingly, courts look at various factors in assessing the intent issue:

(1) the length of time between making the charges and filing bankruptcy; (2) the number of charges made; (3) the amount of the charges; (4) whether the charges were above the credit limit on the account; (5) a sharp change in the buying habits of the debtor; (6) whether charges were made in multiples of three or four per day; (7) whether charges were less than the $50.00 floor limit; (8) the financial condition of the debtor was hopelessly insolvent when the charges were made; (9) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (10) the debtor's employment circumstances; and (11) the debtor's prospects for employment.

*In re Kramer*, 38 B.R. 80, 83 (Bankr.W.D. La.1984) (citations omitted).

■ Although Norwest in its motion to amend and enlarge finding emphasizes repeatedly that the Stewarts obtained cash advances and made purchases within a day or two before consulting an attorney concerning filing a bankruptcy petition, that is not one of the important factors. Indeed, the Stewarts did not use their card after July 21, 1986, the date upon which they consulted an attorney, even though the bankruptcy petition was not filed until August 7, 1986. Parenthetically, the court considers it doubtful that the timing of the petition was planned to avoid the impact of subparagraph (C). That is, whereas filing on August 7, 1986 provided a cushion or margin for error of only $6.22, filing on August 8, 1986 would have excluded another $90.02 from the $500.00 calculation for purchases made within 40 days of the order for relief date. If the timing of the filing had been planned, the Stewarts' counsel would have likely filed a motion to dismiss the complaint based on subparagraph (C) or, at a minimum, would have addressed the calculation question in his opening statement. Indeed he did otherwise question witnesses regarding whether luxury goods or services were purchased.

Norwest continues to argue that the multiple charges on July 20, 1986 constituted "loading up". The court's bench ruling clearly found the Stewarts' explanation reasonable. Anyone who has observed parents shopping in a crowded and hectic discount store with teenage children who are not getting along with each other can understand the strategy of separate trips. Even if the explanation had not been credible, the multiple charges by themselves would not prove that the Stewarts were aware of the call-in limit. As the court noted at the hearing, the evidence did not establish that the Stewarts had any knowledge of the call-in limit. (In the Norwest trial brief, $75.00 is stated as the call-in limit but Mr. Hamilton testified that a $50.00 charge triggers a phone check.) Moreover, the variance in charges at Target and K–Mart on July 19 and 20—from $28.42 to $46.97—alone suggests that the Stewarts were not "loading up" on the one hand while carefully avoiding the call-in limit on the other hand. Surely, they would have found a few more items to purchase per charge within the call-in limit if they truly intended to work a fraud on Norwest. Similarly, the Stewarts would not have attempted to obtain a $265.00 cash advance on July 19 if they were trying

to avoid any action that might jeopardize the active status of their account.

Norwest again equates the three months of inactivity followed by a number of charges on July 19 and 20 with an intent to deceive. Unlike the record in *Kramer*, 38 B.R. at 81, the court did not have the benefit of the Stewarts' entire credit history with Norwest. The Stewarts obtained their credit card from Norwest in 1983. Whether they used their card on a sporadic basis and made multiple charges on one or two days in the past is unknown. Clearly, the court can not find a sharp change in buying habits based on the limited and select record presented by Norwest.

Norwest still argues that the majority of the charges on July 19 and 20 were over the limit. Yet, Mr. Hamilton could not state exactly when the account was increased nor which charge would have been the first one over the limit. There is no evidence in the record that the debtors knew they had charged over the limit on those days. The record indicates only that their credit limit had been raised by $400.00 sometime between the June 16, 1986 statement and the one dated July 16, 1986. Norwest did not establish on what date the Stewarts became aware of the increase nor on what date they received the July 16, 1986 statement. Mr. Stewart testified that he had received letters from Norwest over the past three years praising his credit record and raising his limit. It is not inconceivable that if the Stewarts received such a letter prior to the July 16, 1986 statement and if they actually received the July statement after July 20, 1986, that they thought they had available credit in the amount of $588.00 ($188.00 available credit as of June 16, 1986 plus $400.00 increase). The court is not hereby making such a finding but simply pointing out that Norwest has failed to establish that the Stewarts knew they were over the limit.

With respect to the other *Kramer* factors which Norwest does not appear to raise at this time, the court merely observes that the Stewarts' financial condition was not hopelessly insolvent when they incurred the additional debt. Ms. Stewart had been earning some money by babysitting but apparently had been losing clientele sometime after the June 10, 1986 payment. Mr. Stewart testified that he was employed as a truck driver but subsequently lost his job. The record is not clear as to the specific date. (Mr. Stewart testified that he took the advance on July 19 for road expenses for two weeks.) Mr. Stewart was employed at the time of the hearing.

Finally, despite the emphasis in the request for admissions, in the answers to interrogatories and in the pretrial orders on whether the goods purchased were luxury items, the closing argument by Norwest's counsel sought to persuade the court that the nature of the purchases was not important under subparagraph (A) of section 523(a)(2). However, even before the enactment of subparagraph (C), at least one bankruptcy court looked at whether the purchase was for a luxury item or a necessity. *In re Brashears*, 12 B.R. 136 (Bankr. S.D.Miss.1981). Congress appears to have been somewhat concerned about the distinction as noted in *Smith*, 54 B.R. at 302, n. 2:

> The pre-enactment version explained in the Senate Report provided:
>
> (b) Section 523 of title 11, United States Code, shall be further amended by striking out subsection (d) and inserting in lieu thereof the following:
>
> '(d) For purposes of subsection (a)(2) of this section, any debt which was incurred on or within forty days before the date of the filing of a petition under this title is presumed to be nondischargeable under such subsection; however, such presumption shall not apply to the extent such debts were incurred for expenses which were reasonably necessary for the support of the debtor or the debtor's dependents, and shall be rebuttable by the debtor.'
>
> S.Rep. No. 65, 98th Cong., 1st Sess. 17 (1983). No House or Senate committee reports accompanied the Bankruptcy Amendments and Federal Judgeship Act of 1984, which enacted subparagraph (C).

1984 U.S.Code Cong. & Ad.News (Legis. Hist.) 576.

Accordingly, it is this court's view that the nature of the items purchased should be included in the list of factors bearing on the issue of intent to deceive in a case such as this. With the possible but questionable exception of the cigarettes, the record does not support finding that the Stewarts purchased any luxury items. *See generally In re Blackburn,* 68 B.R. 870, 874 (Bankr.N. D.Ind.1987) (pointing out that "[c]ertain goods may not qualify as necessities and still not be luxuries" and reviewing numerous court determinations regarding luxury goods and services).

Thus, the court restates its conclusion that the Stewarts' $962.33 debt to Norwest is dischargeable.

II. The Award of Costs and Attorney Fees.

With respect to the issue of costs and attorney fees, 11 U.S.C. section 523(d) provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

The purpose of section 523(d) is to discourage creditors from commencing actions such as this one in an effort to obtain a settlement from an honest debtor who might not be able to pay for an attorney to handle an adversary proceeding. S.Rep. No. 95–989, 95th Cong., 2d Sess. 80 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5846.

The Stewarts' attorney requested an award of costs and attorney fees in the answer to the complaint. *See generally Matter of Smith,* 54 B.R. 299, 303 (Bankr. S.D.Iowa 1985) (agreeing with line of cases that hold the debtor need not plead such a request). The court must now determine whether Norwest's complaint to determine dischargeability of the $962.33 debt was substantially justified and, if so, whether special circumstances would make the award unjust.

In its July 19, 1988 objections to defendants' claim for attorney fees, Norwest states the complaint was substantially justified for the following reasons:

1. Debtors sought an attorney for purposes of filing a bankruptcy on Monday, July 21, 1986.

2. That on Saturday, July 19, 1986, Defendants received a $265.00 cash advance draining all but $6.00 of their available credit on their mastercard account.

3. That following three months of relative inactivity, Defendants made twelve charges on the weekend of July 19 and 20, 1986, the majority of those charges over limit and all were made within 48 hours of consulting an attorney for the express purpose of filing a bankruptcy.

4. Plaintiff submits that the foregoing amounts to substantial justification and that to award Defendants attorney fees would be inequitable.

With respect to the first contention, the court has previously pointed out that consultation with an attorney after the charges have been made is not one of the factors scrutinized by courts in deciding the intent issue. Indeed, in its brief Norwest cites the *Kramer* list of factors. *Kramer* does not include the fact upon which Norwest relied. Furthermore, Norwest knew the consultation was after, not before, the charges were incurred as early as April of 1987 when the Stewarts gave their answers to interrogatories. Yet, it proceeded with this case.

Regarding the second contention, the court finds that the fact the Stewarts obtained a cash advance against available credit—against credit made available by Norwest raising the Stewarts' credit limit —does not substantially justify Norwest's complaint.

With respect to the third justification raised by Norwest, the court points out

that Norwest chose to be selective in its presentation of the Stewarts' credit history. It can not expect any trier of fact and law to draw the conclusions it wants regarding the Stewarts' intent from such a limited record. Moreover, Norwest apparently did not consider the timing of its actions (mailing out credit statements and raising the credit limit by $400.00) with those of the Stewarts (charging purchases perhaps before receipt of the July statement and not thereafter). Norwest should have made an effort to determine from its own records when the Stewarts were first advised of the limit increase and when they likely would have received the July 16, 1986 statement in the mail before equating the visual effect of the monthly statement with "loading up". Furthermore, Norwest knew the Stewarts' explanation for the active purchasing on July 19 and 20, 1986 and the nature of the purchases as early as April of 1987 when the Stewarts filed their responses to requests for admissions and their answers to interrogatories. Yet, it proceeded with this case. Indeed, in both the stipulated scheduling order and the final pretrial order prepared by Norwest, the issue of luxury goods was identified as the factual dispute.

The fourth paragraph quoted above from Norwest's objections does not raise any independent ground with respect to substantial justification.

Based on the facts and the law available to it, Norwest was not substantially justified in filing a complaint to determine dischargeability based on section 523(a)(2). As to whether the imposition of what might be viewed as Congressionally mandated but limited sanctions is inequitable in this case, the court finds in the negative.

The previous discussion of the merits of the case in part one of this decision and the immediately preceeding analysis of Norwest's substantial justification arguments alone warrant finding that an award of costs and attorney fees is not "clearly inequitable". See 124 Cong.Rec.H. 11,096 (Sept. 28, 1978); S. 17,413 (Oct. 6, 1978). Moreover, it is obvious to this court that Norwest brought this action relying on the presumption of fraud found in subparagraph (C) of section 523(a)(2). As indicated earlier, there was no basis for alleging that the Stewarts made purchases in excess of $500.00 on or within 40 days of the entry of the order for relief or obtained cash advances in excess of $1,000.00 on or within 20 days. Despite what should have been clear to Norwest from the outset, it proceeded to request the Stewarts to admit that they had made $793.30 worth of purchases within 40 days prior to filing their petition (request # 6) and that the charges exceeded $500.00 and were for luxury goods or services (request # 7).[1] Likewise, in the stipulated scheduling order filed March 24, 1988, which was prepared and signed by Norwest counsel (the Stewarts' attorney did not sign the order nor appear for the conference), the "statement of the facts" is "[t]hat within the forty days prior to the filing of this Bankruptcy Petition the Defendants/Debtors, using the mastercard issued by the Plaintiff, purchased goods and services and borrowed money totaling $793.30". The fact in dispute is identified as "[w]hether or not the expenditures in question were for 'luxury goods and services'". Finally in its trial brief, Norwest again states "[p]laintiff now seeks to have this debt declared non dischargeable by reason of 11 U.S.C. § 523(a)(2)(A), (C)". (Norwest's statement of facts, p. 2.) It was only upon questioning by the court at the close of the evidentiary portion of the hearing and regarding the apparent failure to satisfy the subparagraph (C) requirements, that Norwest's counsel clarified: "Both causes of action are made stated in our original petition and are stated throughout, but at this time and on this we've chosen to proceed only in 522(a)(2)(A)". (Transcript, p. 39.)

■ The Stewarts' attorney has submitted a claim for 14.8 hours of services at $100.00/hour for a total fee award of

---

**1.** Apparently, the defendants likewise did not grasp the distinction between purchases and advances in subparagraph (C) because they admitted the charges exceed $500.00 and were made within the statutory time frame.

$1,480.00. In its objection to the claim, Norwest argues that the time is excessive. It contends that the dilatory behavior and allegedly intentional misrepresentation to the court by defense counsel during the summary judgment hearing regarding not receiving Norwest's discovery requests should not be encouraged.

Although much of the delay and confusion in this case was due to Norwest's unfounded reliance on subparagraph (C), the court can not condone the failure by the attorney for the Stewarts to see that prompt responses to discovery requests were made, to cooperate in preparing the stipulated scheduling order or to appear at the conferences, as required by the March 2, 1988 order and notice for pretrial hearing, to work out the final prehearing order with Norwest's counsel and to file a trial brief as directed by the May 19, 1988 notice and order for trial. Accordingly the court will not approve fees for work related to the summary judgment (1/08/87; 4/01/87; 4/02/87; 4/03/87) and to the stipulated scheduling order and final pretrial order (11/03/86; 3/02/88; 3/04/88; 3/10/88; 3/14/88; 4/04/88; 4/11/88; and 6/07/88). Additionally, the court will not allow fees for services rendered before the complaint was filed (9/26/86; 9/29/86 and 9/29/86) or for entries that lack the specificity required by the standards set forth in *Matter of Pothoven, et al.,* 84 B.R. 579 (Bankr.S.D. Iowa 1988) (12/1/86; 5/23/88; and 5/28/88). The hours disallowed total 7.1. Accordingly, the Stewarts' attorney will be awarded $770.00 for 7.7 hours of service.

### III. Policy Concerns.

At the outset, the court observes that relatively few motions to reconsider are granted even with respect to rulings from the bench. The only way a bankruptcy court entertaining hundreds of hearings and trials per year can control its docket and hold its under advisement list at a reasonable level and age is to rule from the bench when able. Time permitting, this court typically reviews the relevant pleadings, briefs and controlling case law prior to the hearing. Then if the evidence is presented in a relatively clear fashion, the court can render its decision at the close of the evidentiary record. The court both reviewed the complaint and its attached Exhibit 1, the answer, Norwest's brief and pertinent case law prior to the hearing. It ruled on the merits at the conclusion of the evidentiary record. The court believes that the findings and conclusion with respect to the dischargeability issue and the award of costs and attorney fees[2] were specific enough for purposes of appeal. The reason this motion to amend and enlarge finding was granted goes beyond this case.

In the past few months this court has heard other complaints to determine dischargeability which have been based on credit card debt and which have attempted to utilize the presumption of fraud found in subparagraph (C) of section 523. The need for a comprehensive decision for this district has become evident.

Usually the cases turn on what is a luxury good and, if the presumption is otherwise established by satisfying the statutory requirements, on whether the debtor was engaging in abusive prepetition planning by using the credit card to purchase goods and services or to obtain cash advances. So far all the bench rulings have found the challenged debts to be dischargeable. That is because the facts in each case have been in the debtor's favor. Either the purchased items were not luxury goods as viewed by the majority of courts in the *Blackburn* decision or, in the case where the presumption was established, the debtor rebutted it by clear and convincing evidence. (She did not contemplate filing bankruptcy when she purchased the luxury item. Rather an unrelated set of circumstances triggered the filing of her bankruptcy petition.)

By providing for a presumption of fraud in subparagraph (C) and for costs and attorney fees in section 523(d), Congress tried both to address the concern of the

---

2. The bench ruling was not conclusive as to the actual dollar amount that would be awarded upon application and review.

credit community over the deliberate misuse of credit cards by certain cardholders and to protect the honest debtor from being intimidated into reaffirming an otherwise dischargeable debt for fear of incurring a post petition debt for legal fees, thereby impinging upon, if not emasculating, the longed for fresh start. Obviously, there are debtors who have purposely used their credit cards to purchase luxury goods and services and to obtain cash advances without any intention of repaying the issuer. Neither the statutory framework nor the case law benefits them.

However, in the experience of this court, there are just as many, if not more, upright debtors who experienced one or more events that pushed their fragile financial situations into insolvency before they realized it. In many cases, these credit card holders have not developed a cash flow consciousness—an awareness of one's current tab and one's present ability to pay. Meanwhile, the credit card industry in this country has been providing unsecured credit to more and more people on a much larger scale than ever before. The credit card is portrayed as a one way ticket to quick power and prestige (the "clout complex") in a well advertised world of materialism.

Without encroaching upon certain cherished rights in this country, neither Congress nor the courts can interfere directly with what some might view as a misguided "pursuit of happiness" on the part of both the card issuer and the holder. It is for the credit industry and the educational institutions to respond. The former by reassessing the availability of easy credit and of increased credit limits and the latter by instilling in the future generations of borrowers a sense of personal financial responsibility. Emphasis by both upon the "golden mean" rather than upon the "Mi-

das touch" might prove more profitable for all.[3]

At present, the best any bankruptcy court can aim to accomplish is the preservation of the balance created by Congress. That is, the court must see that the losses incurred by the credit industry (and passed on to consumers and borrowers in general) are not enchanced by discharging debt that clearly falls within the exception created by Congress. On the other hand, the court must also take care that the concern over those same losses is not allowed to obviate the fresh start of any honest debtor.

## CONCLUSION

Wherefore, for all the reasons discussed above, the court concludes that:

1. Norwest has failed to establish by clear and convincing evidence that the Stewarts' $962.33 debt is nondischargeable pursuant to 11 U.S.C. section 523(a)(2)(A).

2. Norwest has failed to establish that the complaint was substantially justified or that special circumstances make an award of attorney fees pursuant to 11 U.S.C. section 523(d) unjust.

3. The Stewarts are entitled to attorney fees in the amount of $770.00 for 7.7 hours of services.

Judgment shall enter accordingly.

---

**3.** Perhaps a videotape of a modernized version of *The Way to Wealth* by Benjamin Franklin would have some educational appeal. The well known preface to *Poor Richard's Almanack* contains many a verbal gem of lasting value. The following are but a few:

"'If you would be wealthy, think of saving, as well as of getting ... Beware of little expenses; 'A small leak will sink a great ship', as

Poor Richard says; ... 'Buy what thou hast no need of, and ere long thou shalt sell thy necessaries'.... 'If you would know the value of money, go and try to borrow some; for he that goes a borrowing, goes a sorrowing', as Poor Richard says; and, indeed so does he that lends to such people, when he goes to get it again.' "