**In re Gerry Phyllis KURTZ, Debtor.**

**The MAY DEPARTMENT STORES COMPANY, d/b/a May D & F, Plaintiff,**

v.

**Gerry Phyllis KURTZ, Defendant.**

**Bankruptcy No. 89–B–00239–E. Adv. No. 89–A–0438.**

United States Bankruptcy Court, D. Colorado.

Jan. 24, 1990.

Timothy S. Gibson, Denver, Colo., for plaintiff.

David A. Solomon, Solomon & Lindquist-Kleissler, Denver, Colo., for debtor.

DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge, Sitting by Designation.

Heard on September 27, 1989 on the Complaint of the May Department Stores Company ("May D & F") to determine the dischargeability, pursuant to 11 U.S.C. § 523(a)(2)(A), of a debt in the amount of $2,330.22 incurred by the debtor through an open end credit plan. The debtor, Kurtz, denies the allegations of the complaint, insists that she always intended to pay for the items purchased, and that she did not, at any time, intend to defraud the May D & F by the use of her charge card.

The relationship between the debtor, and the May D & F began approximately two years ago when the May D & F bought out another department store where the debtor was employed as a sales associate. The debtor continues, to our knowledge, to hold this same position with the plaintiff, and in fact had the same job when she made the purchases in question. As a sales associate, Ms Kurtz is entitled to an employee discount for purchases made at the store, as well as the right to participate in special

---

sale days, and as an employee she is also qualified to receive the benefit of a company deferred billing program.

At the hearing, a credit controller of the May D & F, Michael Cooper, testified about the debtor's credit history and charging activity with the store. Specifically, Cooper stated that in October 1988 the debtor's charging activity began to increase beyond normal limits and resulted in a substantial change from the prior history of the account. As evidence of this allegedly high charging activity, the plaintiff introduced copies of the debtor's billing statements from September 15, 1988 through December 16, 1988 (Plaintiff's Exhibit B). These statements show that the debtor's beginning balance in September was $1,462 and her ending balance in December rose to $2,330. During this period, on November 10, 1988, Kurtz charged $700 through the deferred billing program, which meant that these purchases would not be charged to her account until January, 1989. Plaintiff seems to imply that the use of the deferred billing for this large purchase is evidence of an intent to defraud May D & F. However, Ms Kurtz testified, and we believe, that before making this purchase, she contacted the credit department and received authorization to make this large purchase.

The plaintiff first became concerned about Kurtz's account when she exceeded her credit limit in November 1988, and on November 18, 1988, May D & F reduced the debtor's credit limit, by $200, from $1500 to $1300. May D & F concedes however, that it not inform Ms Kurtz of this credit reduction, nor did it ever advise her that she was making too many purchases, or that it would cancel or restrict the use of her credit card. In fact, the evidence establishes that throughout this entire period the debtor consistently paid the required monthly payment on her billing statement. In addition, Ms Kurtz testified that she always intended to pay for the merchandise she purchased, and always believed she had the ability to do so, as she had routinely managed to pay her bills in the past.

In her schedules, the debtor lists five major credit card accounts in addition to her May D & F charge account. During the period in question, the debtor admits taking cash advances on some of these cards and using the funds to pay other bills. Moreover, the debtor also had a $1500 overdraft protection policy with her bank to cover overdrawn checks. At the time of the filing of her petition, the debtor owed $1500 on the overdraft account. In her statement of income and expenses, she lists her net monthly income from all sources as $1,424.51, and her monthly expenditures as $1,856.50.

In late November 1988, the debtor learned, unexpectedly, from her dentist that she needed extensive periodontist work which was estimated to cost $2,000. It was at this point that Ms Kurtz realized for the first time that she was in financial trouble. She called her ex-husband and asked him for financial assistance, which he had given her in the past. However, this time he advised her to speak with a bankruptcy attorney, which she did. Thereafter, on January 6, 1989, Ms Kurtz filed her petition in bankruptcy.

## DISCHARGEABILITY OF DEBT

11 U.S.C. § 523(a)(2)(A) provides that a discharge under section 727 does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

To have a debt deemed nondischargeable, the movant must prove, by clear and convincing evidence, that:

(1) the debtor made a materially false representation;

(2) the debtor had intent to deceive;

(3) the creditor relied on the false representation;

(4) the creditor's reliance was reasonable; and

(5) the creditor sustained a loss as a result of the debtor's representation.

*First Bank of Colorado Springs v. Mullet (In re Mullet)*, 817 F.2d 677, 680 (10th Cir.1987); *Comerica Bank–Midwest v. Kouloumbris*, 69 B.R. 229, 230 (N.D.Ill. 1986).

The Tenth Circuit has made clear that "[e]xceptions to discharge are construed narrowly, and the burden of proving that a debt falls within a statutory exception is on the party opposing discharge." *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir.1986); *In re Mullet, supra*, at 680. Nevertheless, in credit card cases such as the instant one, "[t]he use of the credit card is an implied representation to the issuer that the holder has both the ability and the intention to pay for the purchases and the advances." *Norwest Bank des Moines v. Stewart (Matter of Stewart)*, 91 B.R. 489, 494 (Bankr.S.D.Iowa 1988). "However, insolvency alone does not establish intent to deceive." *Matter of Stewart, supra* (citing *In re Schmidt*, 36 B.R. 459, 460 (E.D.Mo.1983)). The intent to deceive may be inferred "where the debtor knew or should have known that repayment of the debt was impossible," *Matter of Stewart, supra*, although courts agree that "misconceived optimism is not uncommon to the financially distressed." *Id.* For this reason, a number of considerations have evolved as relevant in determining intent:

(1) The length of time between making the charges and filing bankruptcy;

(2) the number of charges made;

(3) the amount of the charges;

(4) whether the charges were above the credit limit on the account;

(5) the sharp change in the buying habits of the debtor;

(6) whether charges were made in multiples of three or four per day;

(7) whether charges were less than the $50 floor limit;

(8) the financial sophistication of the debtor;

(9) whether or not the debtor was employed;

(10) the financial condition of the debtor at the time the charges were made;

(11) whether or not an attorney had been consulted concerning the filing of bankruptcy before the charges were made;

(12) whether the purchases were made for luxuries or necessities.

*Matter of Stewart, supra,* at 495 (citing *In re Kramer*, 38 B.R. 80, 83 (Bankr.W.D.La. 1984)); *United Bank of Denver v. Favinger (In re Favinger)*, 1988 WL 174692, BK No. B 10460 C, A.P. No. 87 E 999 (Bankr.D. Colo. July 29, 1988).

In applying the above factors to the facts in the instant dispute, we conclude that the plaintiff has failed to sustain its burden of proof. Based on the evidence before us, we find absolutely no indication of an intent to deceive by Ms Kurtz. The debtor's account balance at the time May D & F first became concerned was $1,462.45, or just $37.55 below her $1500 credit limit. Neither has the plaintiff satisfied us that any abrupt change occurred in the debtor's use of her charge card after September 1988, which might indicate an intent to deceive. While Ms Kurtz did charge between six and seven purchases a month, no evidence was presented to demonstrate that the months of September through December were any different from prior months. Further, Ms Kurtz testified that she typically purchases more items during the Christmas season than the rest of the year, as is common with most people.

We also find persuasive the fact that Ms Kurtz remained gainfully employed and always made at least the minimum payment due on her monthly statements. In addition, Ms Kurtz testified, and we believe, that she did not realize the extent of her financial difficulties[1] until she learned

---

**1.** Our findings and conclusions herein should not be taken as an endorsement of the debtor's financial habits or common sense in the exercise of her monetary affairs. All we decide here is that she did not defraud the plaintiff.

from her dentist in November 1988, that she would need $2,000 of dental work, and that her ex-husband refused to provide financial assistance, as he had done in the past. We find Ms Kurtz to be a credible witness and accept her assertion that she always intended to pay for the purchases she charged on her May D & F account.

Based on all of the foregoing, we find as a fact and conclude as a matter of law that the debtor did not knowingly make false representations to the May D & F, nor did she intend to deceive the plaintiff by the use of her charge card. Accordingly, it is ORDERED that the plaintiff's complaint is DENIED and the debt owed to the May D & F is discharged.

The debtor's counsel requests that he be awarded attorney's fees pursuant to 11 U.S.C. § 523(d). This is a discretionary call. On the facts before us, we do not feel that an award of attorney's fees is appropriate, and that request is DENIED.

Enter Judgment accordingly.