**In re Doris N. BONO, Debtor.**

**ESSEX BANK, formerly known as Essex County Bank & Trust Company, Plaintiff,**

v.

**Doris N. BONO, Defendant.**

**In re Richard Charles NAHIGIAN, Bankrupt.**

**AMERICAN EXPRESS COMPANY, Plaintiff,**

v.

**Richard Charles NAHIGIAN, Defendant.**

**Bankruptcy Nos. 80–0924–L, 79–1185–L. Adv. No. 80–483.**

United States Bankruptcy Court, D. Massachusetts.

July 25, 1984.

Walter C. Losiewicz, Kalikow & Kalikow, Lynn, Mass., for Essex Bank.

Charles A. Clifford, Charlestown, Mass., for Doris N. Bono.

Gary W. Cruickshank, Riemer & Braunstein, Boston, Mass., for American Express Company.

Arnold Goldstein, Meyers, Goldstein & Chyten, Chestnut Hill, Mass., for Richard Charles Nahigian.

### MEMORANDUM AND ORDERS

### RE: DISCHARGEABILITY COMPLAINTS

THOMAS W. LAWLESS, Chief Judge.

Before the Court are two complaints involving the dischargeability of certain cred-

it card debt owed by two unrelated debtors. The factual circumstances involved are somewhat dissimilar but are representative of two types of credit card dischargeability actions that this Court and other bankruptcy courts see all too frequently. In the interests of judicial economy, the Court will state the law as we understand it and apply said law to the facts at hand.

## CONCLUSIONS OF LAW

■ Various courts have interpreted 11 U.S.C. § 523(a)(2)(A) and its predecessor, 11 U.S.C. § 35(a) of the former Bankruptcy Act, as the same relate to credit card debts. Courts have consistently held that the creditor must prove the following in order to have its debt declared nondischargeable under these sections:

(1) The debtor obtained the property by means of representations which he knew were false or which were made with reckless disregard of their truthfulness;

(2) The debtor had an intent to deceive, which may be inferred from the knowing or reckless misrepresentation made to induce another to transfer property to the debtor; and

(3) The creditor actually and reasonably relied on the misrepresentation.

*See, e.g., In re Kramer,* 38 B.R. 80 (Bankr. W.D.La.1984); *In re Schnore,* 13 B.R. 249 (Bankr.W.D.Wisc.1981). *See also Carini v. Matera,* 592 F.2d 378 (7th Cir.1979). The plaintiff bears the burden of proving each element by clear and convincing evidence. *In re Simpson,* 29 B.R. 202, 209 (Bankr.N. D.Iowa 1983); *In re Vissers,* 21 B.R. 638, 639 (Bankr.E.D.Wis.1982).

■ False pretenses or fraudulent or reckless misrepresentations may be implied by the debtor's conduct or silence. Numer-

ous courts have held that no overt misrepresentation is necessary to find a debt nondischargeable under 11 U.S.C. § 523(a)(2)(A). As stated in *In re Schnore, supra,* at 254:

The debtor's presentment of his or her credit card and signature on the credit receipt in exchange for goods is deemed an implied misrepresentation that the debtor has the intent and ability to pay for the goods. This implied representation makes overt statements of intent and solvency unnecessary.

*See also In re Black,* 373 F.Supp. 105, 107 (E.D.Wisc.1974); *In re Kramer, supra,* at 82.

■ The plaintiff will have met the burden of proving a false representation by the defendant if it can show that the defendant purchased goods by means of the credit card and that the purchases were made at a time when the debtor either did not have the means to or did not have the intent to pay for the goods. *In re Schnore, supra,* at 254. Additionally, purchases made with knowledge that one is not entitled to either use or possess the credit card constitute the type of deception intended to be exempted from discharge. It is even more than an intentional concealment of insolvency; it is an affirmative misrepresentation that one is entitled to possess and use the credit card. *See First National Bank of Mobile v. Roddenberry,* 701 F.2d 927, 932 (11th Cir.1983).[1]

■ Turning to the issue of fraudulent intent, since few people will admit to a fraudulent intent, such intent may be established by circumstantial evidence. *In re Kramer, supra,* at 83. In order to establish fraudulent intent by circumstantial evi-

---

1. The *Roddenberry* case and *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), *cert. denied,* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941) both discuss whether there is a distinction between an overt and implied misrepresentation under Act section 17(a)(2) and Code section 523(a)(2)(A). To the extent that either of these cases hold that intentional concealment of insolvency and present inability to pay does not constitute a fraudulent misrepresentation within the meaning of sections 17(a)(2) and

523(a)(2)(A), I respectfully decline to follow these decisions. I believe the real issue in dispute in these cases was the reasonableness of the creditor's reliance and/or whether the creditor "assumed the risk" of nonpayment. Accordingly, the Court will consider these issues when discussing the third element of the creditor's nondischargeability action—whether the creditor "actually and reasonably relied on the misrepresentation."

632

dence, courts have looked to the following criteria to evidence same: (1) the length of time between making the charges and filing bankruptcy; (2) the number of charges made; (3) the amount of charges; (4) whether the charges were above the credit line on the account; (5) a sharp change in the buying habits of the debtor; (6) whether charges were made in multiples of three or four per day; (7) whether charges were less than the $50.00 floor limit; (8) whether the financial condition of the debtor was hopelessly insolvent when the charges were made; (9) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (10) the debtor's employment circumstances; and (11) the debtor's prospects for employment. *See In re Kramer, supra,* at 83 and cases cited therein.

The element of reliance is difficult to quantify in cases involving the dischargeability of credit card debt because the creditor bank is usually not involved in the transaction between the debtor and the merchant unless it is in excess of $50.00. If the sale is over $50.00, the merchant is supposed to call the bank to obtain the bank's authorization for the proposed transaction. At that point, it can be said that the bank relied on the implied representation of the cardholder of his or her intent and ability to pay for the proposed credit purchase. Whether the bank's reliance is reasonable depends on whether the past relations between the bank and the cardholder support and/or justify the bank's reliance on the cardholder's implied representation when it acquiesces to the purchase in excess of $50.00.

With respect to charges under $50.00, however, it might be argued that the creditor bank "assumed the risk" of nonpayment because ordinarily there are no communications between the cardholder and/or the merchant and the bank. Since the debtor is dealing directly with a third party merchant, arguably there is no reliance by the bank at the time the credit is actually extended. *See First National Bank of Mobile v. Roddenberry, supra,* at 932 ("we hold that the voluntary assumption of risk

on the part of the bank continues until it is clearly shown that the bank unequivocally revoked the right of the cardholder to further *possession and use* of the card, and until the cardholder is aware of this revocation." (emphasis supplied)).

A literal application of *Roddenberry* would permit a cardholder to charge unlimited amounts prior to revocation, file bankruptcy the day after the receipt of the notice of revocation of the credit card and obtain a discharge of the debt. It is doubtful that Congress intended such a result. Where a cardholder embarks upon a credit card spending spree involving charges under $50.00, it is the debtor's conduct that prevents the bank from revoking the debtor's card privileges. Similarly, where a cardholder with a history of charges within a certain amount incurs an inordinate amount of debt within a very short period of time, it is the debtor's conduct that prevents the banks from limiting the use of the card.

 I believe the *Roddenberry* decision should be viewed as a warning of the effect that a creditor's dilatory actions will have on its ability to hold credit card debt nondischargeable. If a card issuer has a history of allowing charges made in excess of the credit card limit and it permits the debtor to make repayment of some minimal amount, it can be said to have assumed the risk of non-payment. In credit card cases, the reasonableness of the bank's reliance must be viewed in light of the debtor's prior card use and the actions which the card issuer takes upon discovery of the charges which it seeks held nondischargeable.

[B]ecause the creditor-bank does not become aware of a debtor's breach of the terms of the credit arrangement, for example, when the debtor makes charges above the credit limit, the bank is unable to immediately protect itself or take actions which would prevent the appearance of its ratification of the debtor's actions. It is the debtor's representations regarding his ability and intention

to pay, made when the credit card is obtained, on which the bank relies. However, because it is an ongoing credit arrangement, the debtor's intentions and ability to repay may change, and these are communicated to the bank through the debtor's payment record. If it is, or should be, apparent to the bank that the debtor no longer has the intention or ability to pay, it cannot be said that the continued reliance by the bank on the original representations is reasonable. Further, if the debtor exceeds the credit limit set forth in the agreement, the bank may acquiesce to the higher amount and, in effect, amend the agreement. Whether or not the bank has done so when it fails to take action against a debtor who has exceeded his credit limit is a fact question for the court. Therefore, even though a bank cannot be required to prove specific reliance at the time an individual charge is made, and cannot be bound by its course of action during the period in which it has no information about the charges made by a debtor, the actions which it takes or fails to take within a reasonable time will be considered by the court as to whether the bank reasonably relied on misrepresentations of the debtor in its continued extension of credit to the debtor.

*In re Lilienfeld,* 36 B.R. 724, 726–27 (Bankr.S.D.Fla.1984).

Applying the law set forth above to the facts at hand, I find as follows:

### Richard Charles Nahigian

■ Richard Charles Nahigian (the bankrupt) was the holder of a credit card issued by American Express Company (American Express). During a three day period of January 17, 1979 to January 19, 1979, the bankrupt charged purchases and services on his American Express credit card totalling $7,817.48. I find this indebtedness plus interest to the date of the bankruptcy filing nondischargeable under § 17(a)(2) of the Bankruptcy Act, formerly 11 U.S.C. § 35.

The bankrupt had been issued an American Express card approximately fifteen years prior to 1979 and his previous high charges had been approximately $2,000 to $3,000. During the period of January 17, 1979 to January 19, 1979, the bankrupt made purchases totalling $7,817.48 at such establishments as Louis, Edward Harvey Company, Saks Fifth Avenue, Stowell's Jewelers and Jordan Marsh. The included charges ranged from $12.50 to $2,827.00. The bankrupt had been employed at Mystic Health Club, Inc., (the Club) at a weekly gross salary of $300.00. The bankrupt was also an officer, director and stockholder of the Club. As a result of a state court receivership, the Club went out of business in February of 1979. The bankrupt's assets as of January 1, 1979, were minimal and remained as such up to the date of bankruptcy on June 25, 1979. The bankrupt was unemployed from February, 1979 to October, 1979.

I find that the bankrupt's use of the American Express card and signing for the purchases impliedly and falsely represented that he could and would repay the indebtedness. I do not believe the bankrupt's testimony that he was the unfortunate victim of sudden, unexpected financial setbacks. As of January 1, 1979, the bankrupt's testimony indicated minimal assets and admittedly noncontingent personal liabilities of $6,400. In addition, the bankrupt was aware of his personal tax liability of at least $10,000 for the health Club, as well as his personal indebtedness of $16,600 as unsecured deficiency claims on corporate notes. Accordingly, I find that the bankrupt knew of the falsity of his representations at the time they were made.

The circumstantial evidence before the Court indicates that the bankrupt intended to deceive American Express. Within a three day period, the bankrupt made charges with his American Express card exceeding one-half of his 1978 gross yearly salary of $15,000. Such action can certainly be described as financial irresponsibility, complete disregard for economic reality and is totally inconsistent with the bankrupt's prior card use. In light of the bankrupt's financial condition, he could not have

believed that he would be able to pay for the purchases. Indeed, the type of purchases made by the bankrupt indicates that he did not intend to pay for them. A portion of the bankrupt's purchases from Louis (an exclusive clothing store), which purchases totalled $2,827.00, were "gifts" to Mr. Nahigian's non-bankruptcy attorney. A $1,800 watch for the bankrupt's wife at Stowell's Jewelers and other purchases at exclusive shops can hardly be classified as necessities and are indicative of a "spending spree".

The timing of the filing of the bankruptcy petition is an important factor in determining the bankrupt's intent. The date of filing, June 25, 1979, is a full five months subsequent to the shopping spree. The bankrupt wants the Court to believe that many unexpected events occurred during the period of time prior to filing. However, close examination of the witness indicated that he signed the bankruptcy petition on April 24, 1979, a full two months prior to the date of filing bankruptcy. Mr. Nahigian was unable to explain the significant gap between the execution of the bankruptcy petition and the filing thereof.

The bankrupt's memory conveniently failed when requested to state to the Court the date he first consulted his bankruptcy attorney relative to filing a bankruptcy petition. Mr. Nahigian did testify that he consulted another lawyer relative to a personal bankruptcy, which lawyer referred him to his bankruptcy attorney. The exact date of said consultation also conveniently eluded Mr. Nahigian's memory. Mr. Nahigian had consulted an attorney prior to January 17, 1979, relative to personal tax liabilities with the Commonwealth of Massachusetts and compensated said counsel with clothing from Louis. Mr. Nahigian's inability to pay counsel fees for representation in collection actions being brought by the Commonwealth of Massachusetts against him personally is ample indication that Mr. Nahigian's personal financial situation prior to January 17, 1979 was extremely tenuous and that he was contemplating a personal bankruptcy prior to that time. Considering all the circumstances, I

infer that the intention to file bankruptcy by Mr. Nahigian was formed prior to and was present on January 17 through 19, 1979. The negative inferences drawn from the mysterious two month gap between the execution and filing of the bankruptcy petition strongly suggest that this conclusion is well-founded.

Mr. Nahigian's expectations of repayment of the indebtedness to American Express were totally unrealistic. His gross monthly salary was $1,200.00 with certain deductions being taken therefrom. The bankrupt's memory of his monthly expenses indicated approximately $500.00–$600.00 per month in expenses. Generously estimating a $300.00 per month surplus, it would have taken in excess of twenty-five months for the bankrupt to repay the charges to American Express.

Further indication of Mr. Nahigian's intent not to repay is his admission that no funds were paid during the five month period between the charges and the filing of bankruptcy. The salary of the bankrupt's spouse should not be considered by the Court in determining his ability and intent to repay American Express. In the five month period between the charges and the bankruptcy filing, no payments were made to American Express by the bankrupt's spouse despite the fact that she received an expensive watch as a result of the bankrupt's extravagant purchases. Her alleged intent to pay a portion of the bankrupt's obligation to American Express never manifested itself in actual payments. I find that it was never intended that the bankrupt's wife would pay any portion of the debt to American Express.

Few people will admit to a fraudulent intent, therefore such intent must be established by circumstantial evidence. If all of the facts are inconsistent with the intent to repay, the use of the credit card is fraudulent. The circumstantial evidence overwhelmingly refutes Mr. Nahigian's claimed good intentions. I find that the bankrupt knew the representations were false and

were made with the intent to deceive American Express.

I find that American Express actually and reasonably relied on the misrepresentations made by the bankrupt. At trial, the bankrupt stated that the Louis' purchases were approved by American Express. Prior to January 17, 1979, the bankrupt's credit record with American Express had been satisfactory. Mr. Nahigian's use of the American Express card and signing for the purchases impliedly represented that he could and would repay the indebtedness. American Express reasonably relied upon this representation as evidenced by their approval of the purchases and their allowing the bankrupt to possess an American Express card for fifteen years. The reliance is thus reasonable based upon the bankrupt's previous satisfactory use of his credit card.

American Express moved quickly to revoke the bankrupt's privileges in mid-February of 1979. Unfortunately, the bankrupt had moved more quickly and by the time American Express realized the situation, the bankrupt had completed his extravagant shopping expedition. American Express relied upon the bankrupt's false representation to its detriment and has sustained the damages as set forth in its complaint.

Based upon the foregoing, I find that the debt of the bankrupt to American Express in the amount of $7,817.48 plus interest to the date of the bankruptcy filing is nondischargeable.

*Doris N. Bono*

Doris N. Bono (the debtor) filed an application for a dual Master Charge/Visa account on November 22, 1978, with Essexbank. The application was approved on November 29, 1978, with a credit line of $500.00. Subsequently, on February 5, 1979, the debtor applied for and was granted an increase in her line of credit to $1,200.00. At that time her balance was $1,284.00.

From February, 1979 to August 16, 1979, the debtor's balance rose to $2,323.66. Due to this escalating balance, in August, 1979, the Essexbank placed the debtor's Master Charge and Visa cards on the so-called restricted card list with the New England Bank Card Association. This list is primarily for stolen credit cards but banks also put cards on it that are over their credit line. The merchants that accept Master Charge and Visa cards receive the list and they are supposed to check the list when any credit card purchase is made. If the card is on the list, the merchant is supposed to confiscate it. As a result of Essexbank's placement of the debtor's cards on the list, the debtor's Master Charge was confiscated by a New Jersey merchant on August 16, 1979.

Notwithstanding this confiscation and a letter from Essexbank in August, 1979, requesting the return of both of the debtor's credit cards, the debtor continued to use her Visa card. The Visa card statements for transactions in late August, September, and early October, 1979 show a large number of charges approaching but not exceeding $50.00. (Ordinarily, merchants do not call for verification when a purchase is under $50.00). From August 16, 1979 to October, 1979, the debtor's balance rose from $2,323.66 to $5,775.83; compared to an increase of $1,000 in her balance in the seven months (February to August of 1979) preceding the confiscation of the Master Charge. The total number of purchases after the confiscation of her Master Charge on August 16, 1979, until her Visa card was finally confiscated in early October, 1979, was in excess of one hundred; all except one of these purchases over this two month period were under $50.00.

After the confiscation of her Visa card, the Essexbank attempted to collect the outstanding balance. On April 30, 1980, Essexbank obtained a default judgment in state court against the debtor in the amount of $7,062.03 (the increase from $5,775.33 to $7,062.03 was due to finance charges). Subsequently, the debtor filed bankruptcy and Essexbank now seeks to hold the entire amount of the state court judgment nondischargeable.

■ I find that until the time the debtor's Master Charge was confiscated, she did not intend to deceive the bank. While the debtor's ability to pay might be objectively questioned, I find that she honestly believed she could and would pay those charges incurred prior to September, 1979. At trial, the debtor appeared unsophisticated with respect to the effect that finance charges of eighteen percent had on an account of several thousand dollars. The debtor made substantial payments on her charges throughout the summer of 1979 after her limit had been retroactively increased to $1,200. She did not recognize that substantial portions of her payments went to interest and not to reduction of the principal amount owed.

■ Moreover, I find that prior to Essexbank's confiscation of the debtor's Master Charge, the bank's reliance on the debtor's representations was unreasonable. Essexbank retroactively increased the debtor's credit limit from $500 to $1,200 at a time when her account was already in excess of $1,200. Subsequent to the credit increase, Essexbank repeatedly allowed the debtor to make charges in excess of her new credit limit while it permitted the debtor to repay the minimal amounts listed on the credit card statements. Prior to confiscation of the Master Charge, Essexbank assumed the risk of non-payment of charges made in excess of the credit limit.

■ In August, 1979, Essexbank sent a letter to the debtor requesting the return of both of her credit cards. Although the debtor stated that she did not go over her statements carefully and that she had trouble with the delivery of her mail, I find that the debtor knew from this written notification and from the confiscation of her Master Charge on August 16, 1979, that Essexbank had revoked the Visa card privileges. Accordingly, the Debtor's presentation of her Visa card to merchants subsequent to August 16, 1979, when she knew her credit card privileges had been revoked, constituted a false representation within the meaning of section 523(a)(2)(A). *See First Na-*

*tional Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983).

I also find that the debtor intended to deceive Essexbank through the use of her revoked card. A fraudulent intent can be inferred from (1) the incredible amount of charges made in such a short period of time; (2) the fact that all but one of the purchases were under $50.00; (3) the debtor's unemployment during the period in question; and (4) a drastic change in the debtor's buying habits whereby the balance owed to Essexbank more than doubled in less than two months. The fact that the debtor made minimal payments to the bank after the credit cards had been confiscated does not overcome what I find to be clear and convincing evidence of the debtor's fraudulent intent.

Finally, I find Essexbank's actions reasonable and appropriate under the circumstances. After finally recognizing the foolhardiness of allowing the debtor continued possession and use of the credit cards, Essexbank should not be held responsible for charges made after it communicated notice of revocation to the debtor. It was the debtor's buying tactics that prevented confiscation of the Visa card at an earlier time. The debtor should not be rewarded for its deception.

Based on the foregoing, I find dischargeable the credit card debt accumulated as of August 16, 1979, in the amount of $2,323.66 (as reflected on the statement dated September 10, 1979) plus interest computed at eighteen percent (18%) to the date of filing, a total amount of $2,613.66. I find nondischargeable the credit card debt incurred after August 16, 1979, plus interest to the date of the bankruptcy petition, a total amount of $4,388.37.

It is so Ordered.