In re James C. COX and Christina L. Cox, Debtors.

The GM CARD, Plaintiff,

v.

James C. COX and Christina L. Cox, Defendants.

Bankruptcy No. 94–43712–JFQ.
Adv. No. 94–4358.

United States Bankruptcy Court,
D. Massachusetts.

June 9, 1995.

Robert S. Cooper, Rochester, NY, for GM card.

James M. Galliher, Bonville & Howard, Fitchburg, MA, for James C. Cox and Christina L. Cox.

### OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

The parties contest the dischargeability of indebtedness resulting from transactions with a credit card, that boon and bane of mankind. The GM Card ("GM") asserts its debt is excepted from discharge as a debt for money or property "obtained ... by ... false pretenses, a false representation, or actual fraud...."[1] GM says that in obtaining goods and cash through use of its credit card, James C. Cox (the "Debtor") impliedly represented he intended to pay, whereas the circumstances existing at the time indicate he had no such intent. Application of the statute to such facts has often challenged courts, with divided results based on at least three different theories. I hold the statute does not apply to misrepresentation of intent to pay when both the representation and lack of intent must be inferred from the circumstances. I also hold, alternatively, the debt is not excepted from discharge because GM did not rely on the representation.

The Debtor moves for dismissal of GM's complaint for failure to state a cause of action, submitting with the motion an affidavit of his wife, Christina L. Cox ("Mrs. Cox"). GM counters with the affidavit of its counsel, to which documents are attached. Following the hearing, at the request of the court, both parties submitted additional affidavits. Because the Debtor's motion and affidavits refer to matters outside the pleadings, I treat the motion as one for summary judgment.[2]

### I. FACTUAL BACKGROUND

The pleadings and affidavits disclose no dispute as to the material factual background. During the time in question, the Debtor and Mrs. Cox each had a GM card in his or her individual name. No debt is owed under the card held in the name of Mrs. Cox, which was inactive in the months before bankruptcy except for payments on a prior

---

1. 11 U.S.C. § 523(a)(2)(A) (1988).

2. *See* Fed.R.Bankr.P. 7012(b).

balance. The present dispute concerns only the debt of $3,547.51 asserted to be owed under the Debtor's card.

The Debtor's card was issued in November of 1993, a few months after issuance of the card in Mrs. Cox's name. Both were issued pre-approved, without any prior application or request for issuance on the part of the Debtor or Mrs. Cox. At no time did the Debtor or Mrs. Cox furnish GM with a financial statement or other financial information. GM did, however, review a credit bureau report on the Debtor and Mrs. Cox prior to issuing the cards. At or about the time GM issued the Debtor's card, it furnished the Debtor with its standard cardholder's agreement. The agreement required a minimum monthly payment equal to 2% of the total balance owed. The Debtor's card had a $3,000 credit limit.

A merchant or bank presented with the card is required to obtain prior authorization from GM before honoring any transaction of $50 or more. This is usually done by scanning the card through a computer terminal. GM furnishes its authorization by supplying an authorization number via its computer. If GM's computer does not authorize the transaction, it furnishes a reason, such as the card being over its limit, delinquent or stolen.

The Debtor's card had a zero balance in January of 1994. Its balances at the end of the succeeding months were as follows: $1,478.04 (2/2/94), $1,725.03 (3/2/94), $1,613.35 (4/3/94), $1,601.02 (5/2/94), and $3,357.85 (6/2/94). Thereafter, the Debtor made no further charges, although interest and late charges accrued to the date of the bankruptcy filing, August 19, 1994. (The asserted debt of $3,547.51 is as of September 2, 1994, and includes some unallowable postfiling interest and late charges).

Payments totaling $565 were made during this period, the last being a $35 payment in April. The present balance reflects merchandise purchases, cash advances and a $1,000 transfer in January of charges from other credit cards. Except for this $1,000 transfer, until May of 1994 the charges in any month totaled less than $500. The May charges were for the following seven cash advances totalling $1,670: $200 (5/2/94), $350 (5/6/94), $20 (5/6/94), $300 (5/19/94), $300 (5/21/94), $300 (5/22/94), and $200 (5/23/94).

The Debtor was employed by Simplex, Inc. in Gardner, Mass. during the time in question. Mrs. Cox was apparently not employed. By May of 1994, the Debtor had fallen behind in paying current expenses, due in significant part to the illness of his infant daughter. The May cash advances of $1,670 were used to pay a variety of expenses, including the following: a late car payment ($235), medical bills ($261.75), late rent ($375), Visa card charges ($281) and a payment to GM on Mrs. Cox's card ($121).

On June 22, 1994, the Debtor discussed his financial problems with a co-worker, who advised him to consult a bankruptcy attorney. Mrs. Cox then looked through the yellow pages and contacted their present counsel. They consulted with counsel on June 23rd. A decision was immediately made to file for bankruptcy, and they paid counsel a retainer of $860 on that day. As previously mentioned, the filing was made on August 19, 1994.

## II. DEBTOR'S IMPLIED MISREPRESENTATION OF INTENT TO PAY

Although there is no dispute as to the foregoing factual background, the parties disagree on whether at the time of the charges the Debtor had formed an intent to pay. If this case were tried, I doubt I would find GM had sustained its burden of proving the Debtor did not intend to pay for the charges. However, for purposes of the present motion, I must regard the underlying circumstances in the light most favorable to GM.[3] In doing so, I conclude a trier of fact could reasonably

3. E.g., Griggs–Ryan v. Smith, 904 F.2d 112 (1st Cir.1990); Reich v. Davidson Lumber Sales, Inc., Employees Retirement Plan, 154 B.R. 324, 328–29 (D.Utah 1993); Commissioner of Ins. of Puerto Rico v. Otero (In re Valle Otero), 174 B.R. 873, 877 (Bankr.D.P.R.1994); United States Lines, Inc. v. American Steamship Owners Mut. Protection and Indemnity Ass'n, Inc. (In re United States Lines, Inc.), 169 B.R. 804, 811 (Bankr.S.D.N.Y. 1994); Union Nat'l Bank of Marseilles v. Leigh (In re Leigh), 165 B.R. 203, 213 (Bankr.N.D.Ill. 1993); Tidwell v. Merchants & Farmers Bank of Milledgeville (In re Dempster, III), 59 B.R. 453, 455 (Bankr.M.D.Ga.1984).

infer that at least by May 1st the Debtor had formed an intent not to pay for further charges. I similarly conclude, in favor of GM, that one could infer from the Debtor signing a credit charge slip a representation he intended to pay GM for the charge.

Thus, for purposes of the present motion, I assume the Debtor did not intend to pay for the May cash advances and he impliedly represented he did intend to pay by signing the charge slip for the advances. The question remains whether this is sufficient to except the debt (or at least the portion resulting from the May cash advances) from discharge pursuant to section 523(a)(2)(A).

### III. IS IMPLIED MISREPRESENTATION OF INTENT TO PAY CONDUCT DESCRIBED IN SECTION 523(a)(2)(a)?

■ Section 523(a)(2), as in effect when this case was filed, is set forth in full in the margin.[4] The question is whether a misrepresentation of intent to pay which must be inferred solely from the circumstances constitutes "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's finan-

cial condition ..." within the meaning of the statute. That is, does the statute apply to misrepresentation of intent to pay when both the representation and absence of intent must be inferred from the circumstances?

### A. Effect of Statute's Exclusion of Implied Representation of Ability to Pay

■ It seems clear from the statute's wording that a debtor's implied representation of his *ability* to pay is outside the statute's coverage. Such a representation is of the debtor's "financial condition." This type of representation is expressly excluded from subparagraph (A).[5] Nor does such a representation come under subparagraph (B). That subparagraph applies only to a "statement *in writing* ... respecting the debtor's ... financial condition...." (emphasis supplied).

Less clear is the effect of this exclusion upon an implied misrepresentation of intent to pay. An individual's intent, that most hidden of human attributes, is invariably ascertained from the surrounding circumstances. When the question concerns intent to pay, the individual's ability to pay is criti-

---

4. Section 523 provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive; or
(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $500 for "luxury goods or services" incurred by an individual debtor on or within forty days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual

debtor on or within twenty days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act;....

5. *E.g., Engler v. Van Steinburg (In re Van Steinburg,* 744 F.2d 1060 (4th Cir.1984) (debtor's oral representation he owned property free of encumbrances ruled representation of his "financial condition"); *Blackwell v. Dabney (In re Blackwell),* 702 F.2d 490 (4th Cir.1983) (oral statements that business was "growing" and "very successful" deemed representations of "financial condition" falling outside statute); *Seepes v. Schwartz (In re Schwartz),* 45 B.R. 354 (Bankr. S.D.N.Y.1985) (debtor's oral statement that he had lucrative law practice and was free of debts deemed representation of "financial condition"). *Compare Household Credit Services, Inc. v. Peterson (In re Peterson),* 182 B.R. 877 (Bankr. W.D.Okla.1995) (exclusion of "statement" respecting debtor's financial condition more narrow than exclusion of "representation").

cal. Did Congress intend to include within subsection (A) implied misrepresentation of intent to pay when a finding of lack of intent must be largely based on the debtor's lack of ability, which itself cannot be the subject of an implied representation covered by the statute?

Representations concerning intent and ability are of course not the same. And yet intent is inextricably linked to ability. As shall be seen, a finding by the fact finder that the debtor lacks intent to pay is typically based primarily upon the debtor's lack of ability to pay.

### B. Decisions on Intent to Pay Under Prior Bankruptcy Act

The decisions are in sufficient disarray to require some history. The wording of section 17a(2) of the prior Bankruptcy Act was similar to present subsections (A) and (B).[6] If a debt was to be excepted from discharge because of the creditor's reliance upon the debtor's false financial statement, section 17a(2) of the prior Act also required that the financial statement be in writing. But unlike subparagraph (A) of the present statute, section 17a(2) did not expressly exclude from its coverage unwritten misrepresentations concerning the debtor's financial condition.

A leading Act decision on implied misrepresentation of intent to pay is Davison–Paxon Co. v. Caldwell.[7] The creditor had there obtained judgment against the debtor in a Georgia court for the price of merchandise sold at the creditor's store. Upon learning of the debtor's bankruptcy, the creditor amended its state court complaint to allege that at the time of the sale the debtor was insolvent and had no intention to pay. After obtaining her discharge in bankruptcy, the debtor sought an injunction in federal court against enforcement of the judgment. Noting the

creditor had made no allegation in its state court complaint of any express representation, the Fifth Circuit held that a purchase with intention not to pay, without any overt representation, is not "false pretenses or false representations" within the meaning of section 17a(2) of the Act. The court came to this conclusion because it believed a bankruptcy statute designed for the relief of debtors should be construed strictly as to its exceptions to discharge, citing Gleason v. Thaw.[8] The court in Davison–Paxon recognized the existence of a body of case law permitting a seller to rescind and reclaim its goods if the buyer received the good without intending to pay. It concluded this case law had no application to section 17a(2).

Among the decisions relied upon in Davison–Paxon is In re Nuttall.[9] In that case, also, the creditor had filed suit against the debtor in state court to recover the price of sold goods. Because the debtor had already filed a bankruptcy petition, the creditor framed its state court complaint so as to attempt to come within the language of section 17a(2). It alleged that at the time of the purchases the debtors, who were business partners, knew or should have known they were insolvent. The debtors then sought an injunction in federal district court against prosecution of the state court complaint. Observing that the complaint contained no allegation of any express representation on the part of the debtor, the court expressed doubt the complaint contained sufficient allegation of "false pretenses or false representations" within the meaning of section 17a(2). The court declined to decide the issue, however, because it believed sufficient relief could be afforded by a temporary injunction against prosecution of the state court action pending completion of the bankruptcy pro-

---

**6.** Section 17a(2) of the Act excepted from discharge debts of the debtor that "are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive...." 11 U.S.C. § 35 a.(2) (repealed 1978).

**7.** 115 F.2d 189 (5th Cir.1940), cert. den. 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941).

**8.** 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915).

**9.** 201 F. 557 (S.D.N.Y.1912).

ceeding, leaving to the state court the decision on dischargeability of the debt.

Other Act decisions hold that a purchase on credit with intent not to pay creates a debt which is nondischargeable under section 17a(2).[10] These decisions do not, however, rely upon the existence of a cause of action of fraud for damages. In concluding the debtor committed fraud and in ruling the debt nondischargeable, they instead rely upon the principle of sales law permitting a seller of goods to rescind the sale and reclaim the goods if the buyer purchased goods without intent to pay.[11] That principle was well established at common law.[12]

None of these decisions involved credit cards. *First National Bank of Mobile v. Roddenberry*,[13] is the leading Act case concerning discharge of credit card debt. The Eleventh Circuit there took a position somewhere between the two existing lines of cases. The court noted that a credit card charge involves no face-to-face transaction between card holder and issuer. Because of this, the court believed, there is an element of risk to the issuer which is inherent in the issuance of the card. The court had in mind particularly the risk the holder might exceed the card's credit limit. The court noted the high interest rates charged on credit cards, suggesting that this compensates the issuer for losses. Because of what it termed a "voluntary assumption of risk" by the issuer, the court held there is no ground to deny a discharge of debt arising from charges made before the issuer communicates to the holder its revocation of the holder's right to use the card.[14] It ruled that charges made thereafter create debt obtained by "false pretenses or false representations" within the meaning of section 17a(2) of the Act. The court believed such purchases amount to "more than an intentional concealment of insolvency," and were "an affirmative misrepresentation that one is entitled to possess and use the card."[15]

## C. *Legislative History of § 523(a)(2)(A)*

In enacting the Bankruptcy Reform Act of 1978, Congress said nothing in the committee reports or floor statements about the conflict in the Act case law over implied misrepresentation of intent to pay. What it did say, however, on the use of financial statements by creditors is revealing. The House report states:

> It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding.... While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge. The forms that the applicant fills out often have too little space for a complete list of debts. Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts. Then, at the bottom of the form, the phrase "I have no other debts" is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting. In addition, the form states that the creditor has relied on the statement in granting the loan.
>
> However, the creditor often has other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts. Nevertheless, if the debtor

---

10. *See e.g., In re Black,* 373 F.Supp. 105 (E.D.Wis.1974); *Nevada Nat'l Bank v. Schneider (In re Schneider),* 3 BCD 175 (Bankr.D.Nev. 1977); *Boerner v. Cicero–Smith Lumber Co.,* 298 S.W. 545 (Comm'n App.Tex.1927); *Hancock v. Blumentritt,* 269 S.W. 177 (Tex.Civ.App.1925); *Atlanta Skirt Mfg. Co. v. Jacobs,* 8 Ga.App. 299, 68 S.E. 1077 (1910); *Louisville Dry Goods Co. v. Lanman,* 135 Ky.Rep. 163 (Ky.1909). *Cf. Higginbotham–Bartlett Co. v. Powell,* 270 S.W. 193 (Tex.Ct.App.1925).

11. *See Boerner,* 298 S.W. 545; *Louisville Dry Goods,* 135 Ky.Rep. 163.

12. *E.g., Rochford v. New York Fruit Auction Corp.,* 116 F.2d 584 (2d Cir.1940); *Burrill v. Stevens,* 73 Me. 395 (1882); *Bidault v. Wales & Sons,* 20 Mo. 546 (1855); *Whitaker v. Brown,* 49 S.W. 1104 (Tex.Civ.App.1899).

13. 701 F.2d 927 (11th Cir.1983).

14. *Id.* at 932.

15. *Id.*

files bankruptcy, creditors with these financial statements are in a position to threaten the debtor with litigation to determine the dischargeability of the debt, based on the false financial statement exception to discharge. Most often, there has been no intent to deceive on the part of the debtor, and, as in so many aspects of the creditor-debtor relationship, the debtor has simply followed the creditor's instructions with little understanding of the consequences of his action.

. . . . .

The threat of litigation over this exception to discharge and its attendant costs are often enough to induce the debtor to settle for a reduced sum, in order to avoid the costs of litigation. Thus, creditors with marginal cases are usually able to have at least part of their claim excepted from discharge (or reaffirmed), even thought the merits of the case are weak.

. . . . .

In order to balance the scales more fairly in this area, H.R. 8200 adopts a compromise. The false financial statement exception is retained, and the creditor, as under current law, is required to initiate the proceeding to determine if the debt is nondischargeable. If the debtor prevails, however, the creditor is taxed costs and attorney's fees, and may be taxed any actual pecuniary damages, such as loss of a day's work, that the debtor might have suffered as a result of the litigation. The present pressure on the honest debtor to settle in order to avoid attorney's fees in litigation over a creditor induced false statement is eliminated. The creditor is protected from dishonest debtors by the continuance of the exception to discharge.[16]

Congress also believed a creditor's reliance on financial statements should be reasonable.[17] It therefor added reasonable reliance as an express requirement under subparagraph (B).

These sentiments seem inconsistent with any Congressional intent to embrace the case law denying discharge because of implied misrepresentation of intent to pay.

### D. *"Actual Fraud"*

In enacting section 523(a)(2)(A) of the Code, Congress added "actual fraud" as a ground for declaring the debt nondischargeable. In doing so, it said this: "Subparagraph (A) is intended to codify current case law, *e.g., Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586 (1877), which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." [18] In *Neal v. Clark,* a dishonest executor sold assets of the probate estate to an innocent purchaser, and pocketed the proceeds. The Court conceded that the purchaser's role in the sale was perhaps a technical wrong, but held this was not enough to prevent the purchaser's discharge in bankruptcy under the Bankruptcy Act of 1867, which excepted from debt debts arising from "fraud" or "embezzlement." [19] The Court ruled that fraud within the meaning of the statute must involve "moral turpitude or intentional wrong." [20] In light of the reference to *Neal v. Clark* in the Code's legislative history, and in light of the stated purpose of Congress to codify current law, it is unlikely Congress intended that the phrase "actual fraud" create a new ground for preventing the discharge of a debt.[21]

Some decisions under the Code nevertheless hold, without reference to the legislative history, that the addition of "actual fraud" overrules *Davison–Paxon* by eliminating the

16. H.R.Rep. No. 595, 95th Sess., 1st Sess. 130–31 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6091, 6092.

17. *Id.* at 364.

18. 124 Cong.Rec. H11,096 (daily ed. Sept. 28, 1978), S17,412 (daily ed. October 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini).

19. 95 U.S. at 709, 24 L.Ed. 586.

20. *Id.*

21. *But see,* Doug Rendleman, *Liquidation Bankruptcy Under the '78 Code,* 21 Wm. & Mary L.Rev. 575, 687–88 (1980), Barry L. Zaretsky, *The Fraud Exception to Discharge Under the Bankruptcy Code,* 53 Am.Bankr.L.J. 253, 257 (1979).

requirement of an overt representation.[22] Without expressly doing so, these decisions seem to employ the rule of construction that *no word of a statute should be considered surplusage.* That rule might be applicable if, for example, section 523(a)(2)(A) contained a reference to "intentional" false representation. But the statute contains no such language. As disclosed by the legislative history, Congress intended only to codify the case law requiring the presence of fraudulent intent.

### E. Code Decisions Ruling Implied Misrepresentation of Intent to Pay is Covered by § 523(a)(2)(A)

Without reliance upon the "actual fraud" language of subparagraph (A), a number of Code decisions hold, as a matter of law, the debtor impliedly represents he intends to pay when he makes a credit card charge.[23]

These courts permit, but do not require, a second inference—that the debtor did not intend to pay. This second inference is typi-

cally based on the debtor's insolvency in either the bankruptcy sense (excess of liabilities over assets) or the equity sense (inability to pay debts as they mature).[24] Seldom do the courts concern themselves with the debtor's ability to make the minimum monthly payment.

In many of the decisions, the courts construct an elaborate list of circumstances to be taken into account in determining the presence or absence of intent to pay.[25] *McCubbin,* for example, contains this typical list of factors: (1) the length of time between the charges and the filing of bankruptcy, (2) whether an attorney was consulted concerning the filing of bankruptcy before the charges were made, (3) the number of charges incurred during the relevant period, (4) the amount of the charges, (5) the financial condition of the debtor when the charges were made, (6) whether the charges exceeded the credit limit, (7) whether there were multiple charges on the same day, (8) whether the debtor was employed, (9) the financial

22. *See e.g., J.C. Penney Co., Inc. v. Shanahan (In re Shanahan),* 151 B.R. 44 (Bankr.W.D.N.Y. 1993) (phrase indicates no representation needed); *Sears Roebuck and Co. v. Faulk (In re Faulk),* 69 B.R. 743 (Bankr.N.D.Ind.1986) (same); *Montgomery Ward and Co., Inc. v. Blackburn (In re Blackburn),* 68 B.R. 870, 879 (Bankr. N.D.Ind., 1987) (addition of phrase clarifies scope of subsection (A) to encompass credit card debt incurred with no intent to pay); *City Nat'l Bank of Baton Rouge v. Holston (In re Holston),* 47 B.R. 103, 108 (Bankr.M.D.La.1985) (*Davison–Paxon* considered reversed by addition of "actual fraud"; charges made after revocation of credit card constitute "actual fraud").

23. *E.g., Eashai v. Citibank, South Dakota (In re Eashai),* 167 B.R. 181 (9th Cir. BAP 1994); *Chemical Bank v. Sigrist (In re Sigrist),* 163 B.R. 940 (Bankr.W.D.N.Y.1994); *First Deposit Nat'l Bank v. Pursley (In re Pursley),* 158 B.R. 664 (Bankr.N.D.Ohio 1993); *FCC Nat'l Bank v. Branch (In re Branch),* 158 B.R. 475 (Bankr. W.D.Mo.1993); *Chevy Chase Sav. Bank v. McCubbin (In re McCubbin),* 156 B.R. 94 (Bankr. M.D.Fla.1993); *Household Card Servs./Visa v. Vermillion (In re Vermillion),* 136 B.R. 225 (Bankr.W.D.Mo.1992); *First Deposit Credit Corp. v. Preece (In re Preece),* 125 B.R. 474 (Bankr. W.D.Tex.1991); *Household Bank v. Touchard (In re Touchard),* 121 B.R. 397 (Bankr.D.Utah 1990); *Manufacturers Hanover Trust Co. v. Cirineo (In re Cirineo),* 110 B.R. 754 (Bankr.E.D.Pa. 1990); *May Dep't Stores Co. v. Kurtz (In re Kurtz),* 110 B.R. 528 (Bankr.D.Colo.1990); *Chase Man-*

*hattan Bank v. Doggett (In re Doggett),* 75 B.R. 789 (Bankr.S.D.Ohio 1987); *Chase Manhattan Bank v. Carpenter (In re Carpenter),* 53 B.R. 724 (Bankr.N.D.Ga.1985); *Essex Bank v. Bono (In re Bono),* 41 B.R. 629 (Bankr.D.Mass.1984); *Manufacturers Hanover Trust Co. v. Hutchinson (In re Hutchinson)* 27 B.R. 247 (Bankr.E.D.N.Y.1983); *First Nat'l Bank in Ft. Myers v. Hadley (In re Hadley),* 25 B.R. 713 (Bankr.M.D.Fla.1982); *see also Citibank South Dakota v. Dougherty (In re Dougherty),* 84 B.R. 653 (9th Cir. BAP 1988) (purporting not to adopt implied representation theory but then approving multi-factor analysis in determining whether debtor had intent to pay); *First Federal of Jacksonville v. Landen (In re Landen);* 95 B.R. 826 (Bankr.M.D.Fla.1989) (stating court bound by *Roddenberry* even though it was an Act decision).

24. *See, e.g., Branch,* 158 B.R. at 478 (debtor's minimal income); *Vermillion,* 136 B.R. at 227 ("insolvency"); *Preece,* 125 B.R. at 478 (lack of employment); *Bono,* 41 B.R. at 633 (excess of liabilities over assets); *Hadley,* 25 B.R. at 714 (debtor unemployed); *Hutchinson,* 27 B.R. at 251 (disability benefits debtor's only income). *Compare Sigrist,* 163 B.R. at 947 (rejecting debtor's insolvency).

25. *See, e.g., Pursley,* 158 B.R. at 668; *McCubbin,* 156 B.R. at 97; *Touchard,* 121 B.R. at 400–02; *Citicorp Credit Servs., Inc. v. Hinman (In re Hinman),* 120 B.R. 1018, 1021 (Bankr.D.N.D.1990); *Kurtz,* 110 B.R. at 530; *Doggett,* 75 B.R. at 792.

sophistication of the debtor, (10) whether the debtor's spending habits suddenly changed, and (11) whether the purchases were for luxuries or necessities.[26]

Despite this long list of factors, these courts often concentrate on the debtor's ability to pay, much like the courts that do not list the factors.[27] They at times emphasize the existence of excess over the card's credit limit.[28] Sometimes the luxurious nature of the goods seems to dominate the court's thinking.[29]

Many courts rule the debtor impliedly represents *both* his intent and ability to pay when he makes a credit card charge. They show no recognition that implied representation of ability to pay is expressly excluded from the statute. And it is often difficult to determine which implied representation—of ability or intent—the court bases its holding upon. In some decisions, the court seems to rely upon both.[30]

### F. *Conclusion*

The assumption of risk theory of *Roddenberry* is too judgmental to support a court decision purporting to apply a statute. True, at the time of a credit card charge, there is a physical separation between the card holder and the issuer which is unique in the relationship of debtors and creditors. And it may well be that this feature of the relationship warrants requiring the issuer to assume the risk of bankruptcy discharge of debts arising from transactions entered into prior to notice of the card's revocation. But these considerations are of the sort that should be taken into account by Congress in drafting legislation, not by a court in applying section 523(a)(2)(A) as enacted.

Many other considerations, however, support interpreting section 523(a)(2)(A) to exclude misrepresentation of intent to pay when both the representation and lack of

intent must be inferred from the circumstances. In the first place, treating the statute to include implied misrepresentation of intent to pay is inconsistent with the statute's express exclusion of implied misrepresentation of ability to pay. Although the two representations are different, when one is present, so too invariably is the other. Moreover, a debtor's lack of intent to pay is usually inferred primarily from his lack of financial ability. The symbiotic relationship between intent and ability is borne out by the many decisions exempting debt from discharge because of misrepresentation of *both* intent and ability. They should for this reason be treated the same under the statute.

The legislative history of subsection (A) is indicative. As has been seen, Congress showed empathy for the legal expense burden of a debtor involved in a discharge dispute related to the debtor's written financial statement. Given that as the sentiment of Congress, it seems unlikely Congress wished to include under section 523(a)(2)(A) an implied representation of intent to pay. Doing so would place at least as great a burden upon the debtor as borne by the debtor in disputes concerning financial statements. As Congress observed, debtors seldom have the funds to engage in these battles, whereas creditors usually do.[31] The creditor typically begins an implied representation of intent case with a salvo of canned discovery requests. This was done in the present case. Discovery, as Debtor's counsel pointed out at argument, is expensive. Burdening a debtor with such litigation makes sense only if the statute clearly requires it.

■ Policy considerations also point toward interpreting the statute to exclude implied representation of intent to pay. Debtors obviously bring with them a history of financial difficulties. It would be ironic if these difficulties were ground for denying

---

26. *McCubbin,* 156 B.R. at 97.

27. *See, e.g., Id.; Pursley,* 158 B.R. at 668–69; *Hinman,* 120 B.R. at 1022.

28. *See, Cirineo,* 110 B.R. at 763; *Doggett,* 75 B.R. at 792.

29. *See, e.g., Hinman,* 120 B.R. at 1022.

30. *See, e.g., Branch,* 158 B.R. at 478; *Vermillion,* 136 B.R. at 227; *Bono,* 41 B.R. at 633; *Hadley,* 25 B.R. at 715.

31. *See* H.R.REP. No. 595, 95th Cong., 1st Sess. 130 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6091.

the discharge of debt. And yet that is the practical effect of permitting an inference of misrepresentation from the debtor's financial circumstances. An exception to discharge should be narrowly construed.[32] If that bromide makes any sense, and I believe it does, surely it applies with full force to this situation.

In addition, it is instructive to consider the origin of the case law denying discharge of a debt for implied misrepresentation of intent to pay. As we have seen, this case law traces back to decisions under the prior Act, which in turn were based upon the sales law principle permitting a credit seller to rescind the sale and reclaim his goods if the buyer purchased them without intent to pay. That principle provided the seller a remedy which merely returned the parties to the status quo. An analogous principle should have no application to a discharge in bankruptcy. The essence of bankruptcy law is to discharge debt and thereby change the status quo by giving the debtor a fresh start. Moreover, section 546(c) of the Bankruptcy Code recognizes the reclamation rights of a credit seller. And U.C.C. § 2-702 enlarges the common law remedy by permitting reclamation if the buyer received the goods while insolvent, without requiring proof of lack of intent to pay. Thus reclamation rights are alive and well in bankruptcy. The ground for reclamation should not be metamorphasized into a cause of action to prevent the discharge of debt.

There is, finally, a consideration of sound jurisprudence. The result of applying a legal principle to particular facts should be relatively predictable.[33] That cannot be said of the case law embracing implied misrepresentation of intent to pay as a ground for nondischargeability. A search for the existence of intent to pay is a difficult process. Any finding on intent is uncertain at best. As has been seen, numerous factors may be considered. And human experience tells us debtors can be unreasonably optimistic despite their financial circumstances. This all makes for a very uncertain result in any given case. For example, in *Citibank (South Dakota) v. Quick (In re Quick)*,[34] the court found from the debtor's testimony that the debtor intended to pay, despite the presence of many of the factors considered by courts as indicators that intent to pay is not present. A creditor, moreover, need only establish grounds for nondischargeability by a preponderance of the evidence, not by clear and convincing evidence.[35] This lesser burden adds to the uncertainty of the result.

This is not to say a debtor should be permitted to engage in a wild spending spree shortly before bankruptcy. Congress calls this "loading up"[36] and in 1984 enacted subparagraph (C) to provide a remedy. In the Bankruptcy Reform Act of 1994,[37] which took effect after the filing of this case, Congress enlarged the creditor's rights under subparagraph (C), but not to a degree that would affect what was done here. Purchases of "luxury goods and services" totaling more than $1,000 are now presumptively nondischargeable if made within 60 days of bankruptcy.[38] So too are cash advances of more than $1,000 obtained within 60 days of the filing.[39] Because of its specified time periods, specific dollar amounts and definition of "luxury goods and services," subparagraph (C) is relatively uncomplex. That makes its application quite predictable. I conclude Congress intended subparagraph (C) to provide the exclusive remedy against "loading up." Many of the circumstances considered by courts as indicators of lack of intent to

---

**32.** *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir.1986); *Barclays Am./Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 879 (8th Cir.1985); *Blackwell v. Commonwealth of Virginia Dept. of Taxation (In re Blackwell)*, 115 B.R. 86, 88 (Bankr. W.D.Va.1990).

**33.** *See, e.g.*, Antonin Scalia, *The Role of Law as a Law of Rules*, 56 U.Chi.L.Rev. 1175 (1989).

**34.** 70 B.R. 562 (Bankr.S.D.Cal.1987).

**35.** *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**36.** S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985).

**37.** Pub.L. No. 103–394.

**38.** *Id.*

**39.** *Id.*

pay under subparagraph (A) relate to what Congress believes to be relevant under subparagraph (C)—for example, the proximity of the charges to the bankruptcy filing and the nature of the goods or services as luxuries. The courts formulated these indicators of intent prior to the enactment of the 1984 amendment inserting subparagraph (C). With the enactment of subparagraph (C), the indicators should be relegated to history. I therefore decline to extend to subparagraph (A) factors which are relevant under subparagraph (C).

For all these reasons, I conclude subparagraph (A) encompasses neither "loading up" charges nor implied misrepresentation of intent to pay when both the representation and the absence of intent to pay must be based upon inference.

## IV. RELIANCE

 As discussed in the preceding section, most courts hold the debtor's use of a credit card necessarily constitutes an implied representation of intent to pay. But even those courts require the card issuer to rely upon the representation.[40] They do so because reliance is one of the five elements of fraud.[41] Those elements are as follows: (1) a representation, (2) falsity, (3) intention to deceive (4) reasonable reliance (or simply reliance), and (5) loss caused by the representation.[42]

GM did not rely, much less reasonably rely, upon an implied representation by the Debtor that he intended to pay. This is so for a number of reasons. First of all, reliance by one contracting party upon the other's implied representation of intent to pay is an unrealistic concept. A party extending credit under a contract relies upon the other's express promise to pay contained in the contract, not a later implied representation of intent to pay flowing from performance. Here, GM furnished the Debtor with an elaborate cardholder's agreement. The agreement includes a promise by the Debtor to pay for all card charges, including charges in excess of the card's limit, plus interest and attorney's fees. With GM in possession of that express promise, it would be irrational for a fact finder to conclude GM relied upon a later implied representation of intent to pay emanating from use of the card. Use of the card did not create a separate contract. The debtor was merely exercising his rights under the parties' contract.

GM's credit investigation also belies any reliance, and certainly reasonable reliance, upon an implied representation by the Debtor of intent to pay flowing from use of the card. Prior to issuing the card, GM reviewed a credit bureau report on the Debtor. That report presumably disclosed the Debtor was sufficiently credit-worthy to justify issuance of the card. GM obviously relied on this report. Otherwise it would not have obtained it. In light of that reliance, it is improbable that GM relied upon any later implied representation of intent to pay.

Also militating against GM's reliance are the mechanics involved in the Debtor obtaining cash advances or other credit. These mechanics include no transmitted communication from the Debtor to GM. The bank (or merchant) simply passed the Debtor's card through a computer and received GM's computerized authorization. Prior to that authorization, all the Debtor did was to present the card to the bank. It is unrealistic to infer from the Debtor's transaction with the bank an implied representation of intent to pay GM, an absent party. The bank was looking for payment from GM, not the Debtor. After GM authorized a transaction, the Debtor signed the card charge slip. Because this promise is directed at GM, one could

---

**40.** *E.g., Citibank South Dakota, v. Dougherty (In re Dougherty)*, 84 B.R. 653 (9th Cir. BAP 1988); *Norwest Bank of Iowa v. Orndorff (In re Orndorff)*, 162 B.R. 886 (Bankr.N.D.Okla.1994); *First Deposit Nat'l Bank v. Pursley (In re Pursley)*, 158 B.R. 664 (Bankr.N.D.Ohio 1993); *FCC Nat'l Bank v. Branch (In re Branch)*, 158 B.R. 475 (Bankr.W.D.Mo.1993); *Household Bank, N.A. v. Touchard (In re Touchard)*, 121 B.R. 397 (Bankr. D.Utah 1990); *First Fed. of Jacksonville v. Lan-* *den (In re Landen)*, 95 B.R. 826 (Bankr.M.D.Fla. 1989); *Chase Manhattan Bank (U.S.A.) v. Carpenter (In re Carpenter)*, 53 B.R. 724 (Bankr.N.D.Ga. 1985); *Central Bank v. Kramer (In re Kramer)*, 38 B.R. 80 (Bankr.W.D.La.1984).

**41.** *Id.*

**42.** *Id.*

infer a representation of intent to pay GM from that act. But this occurred after GM's authorization of the transaction, so that GM was not relying upon it as a prior representation in making the authorization. Of course, GM gave its authorization on the condition that a charge slip be signed, but that is something quite different from reliance upon a prior representation.

The mechanics of the card transactions pose difficulties concerning reliance beyond those created by chronology. GM, through its computer, was relying only upon the presence or absence of programmed triggering events—prior payment default, a transaction in excess of the card's credit limit or the card having been stolen.

Courts purporting to require reliance ignore all these considerations. The decisions are Kafkaesque. Many courts state reliance is necessary and then ignore the requirement altogether in concluding fraud has been committed.[43] Other courts find reliance in a fashion which pays mere lip service to it. One court, for example, has said reliance by the issuer "is inherent in the system because a cardholder in using the credit card forces the issuer to honor its guarantee to the merchant." [44] Confusing reliance with the due care, other courts find reliance present because the issuer acted with ordinary diligence.[45] Still others acknowledge that a credit card transaction is *sui generis* and find reliance from the fact charges were made under the card.[46] These decisions attempt to fit a square peg into a round hole. A credit card transaction involves no reliance upon an implied representation of intent to pay.

For the foregoing alternative reasons, a separate judgment has issued declaring GM's debt dischargeable.

**JUDGMENT**

The court having issued a separate opinion containing reasons supporting a discharge of the Defendants' indebtedness to the Plaintiff, it hereby

ORDERED, ADJUDGED AND DE-CREED, that the Defendants' indebtedness to the Plaintiff is dischargeable in this bankruptcy proceeding.

---

**43.** *E.g., Dougherty,* 84 B.R. 653; *Branch,* 158 B.R. 475; *Kramer,* 38 B.R. 80.

**44.** *Citicorp Credit Servs., Inc. v. Hinman,* 120 B.R. 1018, 1022 (Bankr.D.N.D.1990).

**45.** *See, e.g., Bank One Columbus, v. McDonald (In re McDonald),* 177 B.R. 212 (Bankr.E.D.Pa. 1994).

**46.** *E.g., First Deposit Nat'l Bank v. Pursley (In re Pursley),* 158 B.R. 664 (Bankr.N.D.Ohio 1993); *Ohio Citizens Bank v. Satterfield (In re Satterfield),* 25 B.R. 554 (Bankr.N.D.Ohio 1982). *Compare Manufacturer's Hanover Trust Co. v. Ward (In re Ward),* 857 F.2d 1082 (6th Cir.1988) (reasonable reliance not present because of absence of prior credit investigation); *First Card v. Leonard (In re Leonard),* 158 B.R. 839 (Bankr. D.Colo.1993) (same).