In the Matter of Brian Lee CRON, Cheryl Anne Cron, Debtors.

Novus Services, Inc., servicing agent for Greenwood Trust/Discover Card, Plaintiff,

v.

Cheryl Anne Cron, Defendant.

Bankruptcy No. 97–02831–C J. Adversary No. 97–97213.

United States Bankruptcy Court, S.D. Iowa.

April 28, 1999.

Gary R. Hassel, Des Moines, Iowa, for debtor.

Karen A. Taylor, Des Moines, Iowa, for Novus Services, Inc.

## MEMORANDUM OF DECISION

LEE M. JACKWIG, Bankruptcy Judge.

Plaintiff Novus Services, Inc., servicing agent for Greenwood Trust/Discover Card, filed a complaint against Debtor Cheryl A. Cron (Defendant). Plaintiff asks the Court to find cash advances used for gambling purposes nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Since the Defendant obtained more than $1,000.00 in cash advances within 60 days before the order for relief was entered, the Plaintiff invokes Paragraph C of section 523(a)(2). Having conducted a trial in the matter and having reviewed the record and the arguments of the parties, the Court now enters its decision.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334 and the standing order of reference entered by the U.S. District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

In 1995 the combined gross income of Brian Lee Cron and Cheryl Anne Cron (Debtors) was $44,157.00. (Defendant testified that her husband earned approximately $34,000.00 and she earned $7.00 an hour. Paragraph one of the Statement of Financial Affairs indicates he earned $34,-190.00 and she earned $9,967.00.)[1] The Debtors' two daughters, aged 16 and 17 resided with them. Defendant testified she did not use the Discover Card for gambling purposes that year. Defendant stated she had the card for more than two or three years. (Schedule F, the list of unsecured nonpriority claims, suggests the Debtors became cardholders in 1989.)

In 1996 the Debtors' combined gross income was $1,207.00 less than in 1995. (Defendant testified that her husband's income was reduced somewhat and she earned $800.00 per month. Paragraph one of the Statement of Financial Affairs indicates he earned $35,418.00 and she earned $7,532.00.)[2] At least one daughter continued to reside with them. (The date on which the older daughter left to live with her boyfriend is not clear from the record. The Debtors did not provide support to the daughter when she was living away from home.) Defendant testified that she began gambling at Prairie Meadow Race Track and Casino (Casino) in April of that year. She used only her Discover Card at the Casino. She applied her winnings first and foremost to the Discover Card debt. She applied any excess to other debts. She always tried to pay more than the minimum monthly amount. (Exhibit A contains check number 4651 that indicates $250.00 was paid to Discover Card on November 13, 1996 and check number 4679 that indicates $200.00 was paid to Discover Card on December 13, 1996.) The Debtors were able to keep current on their other bill payments during that year.

In the first five months of 1997 the Debtors' combined gross income on average was approximately 16 percent less than in 1996. (Paragraph one of the Statement of Financial Affairs, signed June 13, 1997, indicates the Defendant's husband had earned $12,807.00 and she had earned $2,188.00. According to Interrogatory Answer 5 in Exhibit 1, the Defendant was earning a gross monthly income of $342.00 and a net monthly income of $260.00 working at Target as of April 22, 1997 and a gross monthly income of $770.00 and a net monthly income of $520.00 working at Burger King as of May 14, 1997. According to Interrogatory 8 in Exhibit 1, her husband was earning gross monthly in-

---

**1.** $34,190.00 + $9,967.00 = $44,157.00.

**2.** $35,418.00 + $7,532.00 = $42,950.00.

$44,157.00 − $42,950.00 = $1,207.00.

come of $2,255.00 in April, and $2,469.00 in May, and $2,255.00 in June of 1997.)[3]

On March 29, 1997 the Debtors' oldest daughter, her boyfriend and Brandon, their newborn baby, moved into the Debtors' home. The daughter and her boyfriend each paid the Debtors $100.00 per month while residing in the Debtors' home. (It is not clear what became of the younger daughter in 1997. No testimony was presented on that matter. Schedule J, the list of monthly expenses, only suggests she was not a dependent of the Debtors as of the petition date.)

During the first five months of 1997 the Defendant continued to go to the Casino, continued to use only the Discover Card for gambling purposes, continued to earmark her winnings for payment of the Discover Card debt, and continued to make more than minimum monthly payments. On cross-examination the Defendant seemingly disagreed that she completely paid off the Discover Card debt in the first three months of 1997. (Exhibit A contains check number 4713 that indicates $500.00 was paid to Discover Card on January 15, 1997, check number 4721 that indicates $1,864.50 was paid to Discover Card on January 31, 1997, check number 4758 that indicates $2,300.00 was paid to Discover Card on March 3, 1997, check number 4760 that indicates $1,000.00 was paid to Discover Card on March 7, 1997 and bears the notation "extra payment," and check number 4763 that indicates $1,811.97 was paid to Discover Card on March 10, 1997. On cross-examination, the

Defendant stated the March payments were from gambling winnings.)

According to Paragraph 3 of the Statement of Undisputed Facts in the April 14, 1998 Joint Final Pretrial Statement and Order, the Defendant incurred seventeen cash advances totaling $6,744.88 between April 22, 1997 and May 14, 1997.[4] According to the exhibit attached to the complaint, Defendant incurred three advances totaling $1,769.97 on April 22, 1997 and one advance in the amount of $519.99 the following day. (The record does not clarify if all four advances were obtained on one overnight trip to the Casino.) Then on April 30, 1997 the defendant incurred six cash advances totaling $2,478.96. On May 5, 1997 she incurred three cash advances totaling $509.99. On May 13, 1997 she incurred two advances totaling $320.00 and on May 14, 1997 she incurred three advances totaling $1,145.97. (Again, the record does not clarify if May 13 and 14 amount to one trip to the Casino.) The exhibit shows other charges for two overlimit fees and numerous transaction fees.[5]

The parties agree in paragraph 3 of the Statement of Undisputed Facts that the Defendant did not make any of the required minimum monthly payments after obtaining the cash advances in issue. Defendant, however, testified that she never used the Discover Card without the expectation and intent of paying off the incurred debt.

Moreover, Defendant testified that the boyfriend broke Brandon's arms and ribs

3. $12,807.00 + $2,188.00 = $14,995.00 divided by 5 = $2,999.00 × 12 =$35,988.00. $42,950.00 − $35,988.00 = $6,962.00. $6,962.00 × 100.00 divided by $42,950.00 = 16.21.

4. The exhibit attached to the Complaint consists of three pages of the card member statement with a closing date of May 23, 1997 and one page of the card member statement with a closing date of June 23, 1997. The former reveals 12 comchecks and 6 other Casino charges that total $6,744.88. (The comchecks add up to $5,724.88. The other charges add up to $1,020.00.)

5. The May 23, 1997 statement attached to the Complaint sets forth 18 transaction fees that total $168.61 and one $20.00 fee for being over the $6000.00 credit limit. Therefore, the total amount owing as of that closing date was $6,933.49. The payment due date was June 17, 1997. The minimum amount due was $145.00. The June 23, 1997 statement adds to the previous balance a $204.57 finance charge and another $20.00 overlimit fee for a grand total of $7,158.06.

in early June of 1997. The boyfriend went to jail. Though Defendant thought her daughter would have custody of Brandon, the authorities decided otherwise. The daughter was required to leave the Debtors' home, and Brandon was entrusted to the care of the Debtors. As a result, the Defendant quit working to care for Brandon. As explained in Defendant's answer to Interrogatory No. 9 in Plaintiff's Exhibit 1, the Debtors began incurring expenses related to infant care. Insurance did not cover all of Brandon's medical expenses. About the same time, the Defendant's husband learned that his employer was curtailing overtime.

Soon thereafter—on June 5, 1997, the Debtors consulted an attorney about the merits of filing a bankruptcy petition. On June 16, 1997 they filed a petition for relief under Chapter 7. According to her answer to interrogatory No. 4 in Plaintiff's Exhibit 1, this was the first time the Defendant sought bankruptcy relief.

Though Defendant testified on redirect examination that the Debtors were current on all their bills and though she testified on cross-examination that the Debtors had $300.00 monthly disposable income post payment of monthly expenses prior to June of 1997, she insisted at various times during her testimony that there was not enough money to meet existing debt after the change in circumstances. (Schedules I and J reveal a monthly shortfall of one dollar. Schedule F reflects $30,400.00 in unsecured debts.)

The Defendant testified that she has not worked in the interim, her husband's overtime has stopped, and he has taken time off whenever necessary for certain court appearances related to their grandson's situation. She stated the Debtors' 1997 gross income amounted to approximately $28,000. (Schedule I, reflecting monthly income, indicated the Debtors' gross monthly income was $2,354.00 as of the petition date. Not taking into account any

6. $2,354.00 \times 12 = $28,248.00.

overtime or a change in the rate of pay for the Defendant's husband, that figure suggests an annual gross income of $28,248.00.)[6] She estimated their 1998 gross income would be approximately $27,000.

## DISCUSSION

I. *The Typical Section 523(a)(2)(A) Case.*

 11 U.S.C. § 523(a)(2)(A) provides in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . .

11 U.S.C. § 523(a)(2)(A). To prevail on a nondischargeability action brought pursuant to this section in the Eighth Circuit, the creditor must prove all of the following:

(1) that the debtor made a representation that was false;

(2) that the debtor realized the representation was false when it was made;

(3) that the debtor planned on the false representation misleading the creditor;

(4) that the creditor justifiably relied on the false representation; and

(5) that the creditor suffered a loss as a proximate result of that representation.

*See Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987) (setting forth the five elements but indicating reliance must be reasonable); *In re Ophaug*, 827 F.2d 340 (8th Cir.1987) (holding reliance in fact is enough); and *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (holding reliance must be justifiable—that is, something more than reliance in fact

but something less than strict reasonable reliance).[7] The standard of proof is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 Since direct proof of fraudulent intent is rare, the creditor may present circumstantial evidence to establish the debtor's intent to deceive. *Van Horne*, 823 F.2d at 1287. A debtor's self-serving statement of honest intent will not overcome an inference of fraudulent intent unless the debtor's actions generally support the debtor's assertion of no wrongdoing. *Id.* at 1287–88. Some of the actions or conditions that may speak louder than words in a credit card case include:

(1) the debtor's financial sophistication;

(2) the debtor's financial situation at the time the charges were incurred or the cash advances were obtained;

(3) the debtor's present employment;

(4) the debtor's employment prospects;

(5) whether the debtor consulted an attorney about filing for bankruptcy relief or otherwise seriously pondered the pros and cons of seeking that form of debt relief before incurring the charges or obtaining the cash advances;

(6) the length of time between incurring the charges or obtaining the cash advances and seeking relief under the Bankruptcy Code;

(7) whether the charges and advances were for luxuries or necessities;

(8) whether there was a significant change in the debtor's spending habits;

(9) the number of charges and cash advances;

(10) whether there were multiple charges or advances per day;

(11) the amount of the charges and cash advances;

(12) whether the charges or cash advances exceeded the credit limit; and

(13) whether the charges or advances were just under or at any dollar limits for a single purchase or advance.

*See In re Ellingsworth*, 212 B.R. 326, 335 (Bankr.W.D.Mo.1997); *Matter of Stewart*, 91 B.R. 489, 495 (Bankr.S.D.Iowa 1988). The nonexclusive list merely assists a court in assessing a particular debtor's credibility. No objective number or combination of factors compels a court's ultimate finding of fact regarding a debtor's intent. *In re Briese*, 196 B.R. 440, 452 (Bankr.W.D.Wis.1996) (citing *In re Alvi*, 191 B.R. 724, 734 (Bankr.N.D.Ill.1996)).

II. *The Congressional Presumption Case.*

Given the facts of this case, 11 U.S.C. § 523(a)(2)(C) is the cornerstone upon which the Court's analysis must be based. The version of § 523(a)(2)(C), in effect on the date the order for relief was entered in the Debtors' Chapter 7 case, states:

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1000 that are extensions of consumer credit under an open end credit plan obtained by an

7. Courts vary in the way they analyze the 11 U.S.C. § 523(a)(2)(A) elements in the context of a credit card case. Numerous decisions have compared and contrasted the assumption of the risk approach, the implied representation theory and the totality of the circumstances method. *See* National Bankr. Rev. Comm'n, *Bankruptcy: The Next Twenty Years*, 180–96 (1997). In *Matter of Stewart*, 91 B.R. 489, 494 (Bankr.S.D.Iowa 1988), I discussed the implied representation theory— a credit card holder's use of the card is an implied representation to the issuer that the holder has both the ability and the intent to pay for the purchases and the advances. In numerous bench rulings in the interim, I have reminded Plaintiffs that a debtor's inability to pay does not by itself establish intent to deceive. *Id.* at 494–95. I likewise have cautioned that neither the inability nor the lack of intent to pay off the full balance, upon receipt of the statement immediately following the charges or advances in issue, mandates a finding of fraudulent intent.

individual debtor on or within 60 days before the order for relief under this title, are *presumed to be nondischargeable;* "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act;

11 U.S.C. § 523(a)(2)(C) (emphasis added).[8] The legislative history for § 523(a)(2)(C) explains how a debtor may rebut the presumption that a particular debt, otherwise meeting the specific requirements of § 523(a)(2)(C), is nondischargeable:

Section 523 is amended and expanded to address a type of unconscionable or fraudulent debtor conduct not heretofore considered by the code—that of loading up. In many instances, a debtor will go on a credit buying spree in contemplation of bankruptcy. The new subsection (d) creates a rebuttable presumption that any debt incurred by the debtor within 40 days before the filing of the petition has been incurred under the circumstances that would make the debt nondischargeable. Only that portion of a debt which was incurred within the 40–day time period is subject to this presumption. *The burden is upon the debtor to demonstrate that the debt was*

*not incurred in contemplation of discharge in bankruptcy and thus a fraudulent debt.* As the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtors dependents are not covered by the presumption.

S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985). In 1994 Congress extended the presumptive period from 40 days to 60 days. *See* H.R.Rep. No. 103–834, 103rd Cong., 2nd Sess. 40 (Oct. 4, 1994); 140 Cong.Rec. H10770 (Oct. 4, 1994).

■ The language of the statute is clear on its face—debts meeting the criteria of § 523(a)(2)(C) are presumed to be nondischargeable. Consistent with the statutory language, the above-quoted legislative history states that such a debt is presumed to be "incurred under the circumstances that would make the debt nondischargeable." Thus, once the creditor establishes the applicability of the presumption, the creditor's burden of proving the debt is nondischargeable based on the elements of a § 523(a)(2)(A) cause of action is lifted.

■ The legislative history augments the statutory language by explaining that a debtor may rebut the presumption of nondischargeablility if the debtor establishes that the debt was not incurred in contemplation of obtaining a discharge in bankruptcy. Unlike the legislative history for the presumption found in 11 U.S.C. § 547(f),[9] the legislative history for section

8. In 1994 Congress amended 11 U.S.C. § 104, governing the adjustment of dollar amounts in certain sections of the Code, by adding a provision that required the existing dollar amounts set forth in section 523(a)(2)(C) to be adjusted on April 1, 1998, and at each 3–year interval ending April 1 thereafter, to reflect changes in the Department of Labor's most recent Consumer Price Index for urban consumers. Such adjustments do not apply to cases commenced before the date of the adjustment. Bankruptcy Reform Act of 1994, Pub.L. No. 103–394 (Oct. 22, 1994).

9. 11 U.S.C. § 547(f) provides: "For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90

days immediately preceding the date of the filing of the petition." The following legislative history is contained in both the House Report and the Senate Report:

Subsection (f) creates a presumption of insolvency for the 90 days preceding the bankruptcy case. The presumption is as defined in Rule 301 of the Federal Rules of Evidence, made applicable in bankruptcy cases by sections . . . of the bill. The presumption requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption, but the burden of proof remains on the party in whose favor the presumption exists.

523(a)(2)(C) does not define the presumption in terms of Federal Rule of Evidence 301.[10]

 Despite the straightforward statute and the additional but generally consistent legislative history, the case law interpreting section 523(a)(2)(C) is diverse. Some courts hold, as I am doing in this decision, that the presumption transforms the burden into one of proving the debt is dischargeable and places that burden squarely on the shoulders of the debtor. *Ellingsworth*, 212 B.R. at 339–40 (debtor's intent, not creditor's conduct, determines dischargeability). *See also In re Hernandez*, 208 B.R. 872, 881 n. 17 (Bankr. W.D.Tex.1997) (presumption section operates independently, meaning the element of reliance does not arise "except perhaps as a defensive issue on the part of the debtor to rebut the presumption") and *In re Acker*, 207 B.R. 12, 16–17 (Bankr. M.D.Fla.1997) (burden of proof shifts to debtor to prove intent to repay existed at time debt was incurred). *Compare In re Kitzmiller*, 206 B.R. 424, 428 (Bankr. N.D.W.Va.1997) (since the "sole evidence of the charges satisfies the 5 elements of fraud," the debtor bears the burden of rebutting the presumption of nondischargeability by rebutting any one of the five elements—"the debtor could adduce evidence that negates the presumption that the creditor relied on a representation of the debtor.").

H.R.Rep. No. 595, 95th Cong., 1st Sess. 375 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 89 (1978).

10. Federal Rule of Evidence 301, made applicable to bankruptcy cases and proceedings by Federal Rule of Bankruptcy Procedure 9017, provides:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion,

Other courts limit the nature and extent of the presumption. *In re Fulginiti*, 201 B.R. 730, 733–34 (Bankr.E.D.Pa.1996) (presumption only shifts the initial burden of production and only shifts that burden with respect to the element of intent). *Accord Norwest v. Fasano*, No. 95–95166, slip op. at 5–7 (Bankr.S.D.Iowa June 24, 1997) (Judge Hill decision book entry number 291), *aff'd Norwest v. Fasano*, No. 97–CV–90562, slip op. at 7–8 (S.D.Iowa March 23, 1998). *Compare In re Simos*, 209 B.R. 188, 195 (Bankr.M.D.N.C.1997) (presumption shifts initial burden of going forward with the evidence); *In re Vernon*, 192 B.R. 165, 171 (Bankr.N.D.Ill.1996) (presumption does not shift the burden of proof and the plaintiff bears the ultimate risk of nonpersuasion).

## DISPOSITION

 The parties have stipulated that the Defendant obtained more than $1,000.00 in cash advances within 60 days before the order for relief was entered. The parties did not indicate there was any controversy over the cash advances being extensions of consumer credit under an open end credit plan in either their Statement of Disputed Facts or Statement of Issues. Accordingly, I find the 11 U.S.C. § 523(a)(2)(C) presumption of nondischargeability applies in this case.[11]

The Defendant, however, has overcome that presumption not merely by a preponderance of the evidence but by clear and convincing evidence.[12] The Defendant has

which remains throughout the trial upon the party on whom it was originally cast. Fed.R.Evid. 301.

11. Even if the Casino charges could be distinguished from the comchecks, they also exceeded $1,000.00. *See supra* note 4. Nothing in the record suggests those charges would have been incurred for necessities.

12. Whether only clear and convincing evidence or a preponderance of the evidence rebuts a presumption that is not governed by Federal Rule of Evidence 301 appears to be unresolved and somewhat dependent upon a court's conclusions about the nature and ex-

established that it is not only more likely than not that she did not obtain the cash advances in issue in contemplation of being able to discharge them in Chapter 7, but it is highly probable that she did not act with such a fraudulent intent. The majority of the "intent factors" support the Defendant's self-serving statement of honest intent:

(1) The Defendant is a relatively sophisticated consumer. She used Plaintiff's credit card in a conscientious fashion. That she used the card for gambling does not undermine this assessment. Except for the advances in issue, she responsibly earmarked winnings for payment of her debt to Plaintiff and otherwise managed to repay the amounts she owed Plaintiff in 1996 and early 1997.

(2) The Debtors' financial condition between April 22, 1997 and May 14, 1997 may not have been as good as it was in April of 1996 when the Defendant began frequenting the Casino, but the sixteen percent decrease in income did not render the Debtors hopelessly insolvent.

(3) Both Debtors were employed.

(4) The Debtors' prospects for employment were relatively the same as they had been in recent years. The record does not establish that the Defendant had any reason to anticipate her husband's overtime would be curtailed in June of 1997 or that she would find it necessary to cease working to care for her grandson.

(5) The Debtors consulted an attorney for advice about bankruptcy relief after the advances in issue were obtained—after they became responsible for their grandson's care and the Defendant's husband learned his employer was curtailing overtime. The record does not suggest the Defendant ever contemplated pursuing a discharge of her debts prior to that time.

(6) The Defendant obtained the cash advances between 55 and 33 days before the Debtors filed for relief under Chapter 7. Absent the income altering events in early June of 1997, the Defendant should have been able to continue to make at least the minimum payments on the amount she owed the Plaintiff and the Debtors otherwise should have been able to keep current on their other bills. The events, however, both lessened the Debtors' monthly income and increased their monthly expenses. Suddenly the balance of unsecured debt threw them off their financial equilibrium.[13]

(7) Yet, the advances were not for necessities.[14]

(8) There was no significant change in the Defendant's use of the Plaintiff's card insofar as she had been using the card at

---

tent of the burden that is shifted by the existence of the presumption. *Compare Tenneco Chemicals v. William T. Burnett & Co.*, 691 F.2d 658, 663–64 n. 9 (4th Cir.1982) (presumption of validity in patent cases shifts the burden of proof, and rebuttal requires clear and convincing evidence) *with Felton v. Trustees of Cal. St. Universities and Colleges*, 708 F.2d 1507, 1508–09 (9th Cir.1983) (Title VII plaintiff's prima facie case of unlawful discrimination shifts only the burden of production, and rebuttal does not require clear and convincing evidence).

**13.** The May 23, 1997 statement reflecting the cash advances obtained in April and May would have arrived at the Debtors' door in early June. According to the information contained in Schedules I and J, filed with the petition on June 16, 1997, the Debtors would not have had enough disposable income to make the minimum payment of $145.00 by the June 17, 1997 due date. Parenthetically, had the Debtors been forced out of Chapter 7 under 11 U.S.C. § 707(b) or had the Debtors initially sought relief under Chapter 13, this does not appear to be a case in which unsecured creditors would have received much, if any, return.

**14.** The plain language of 11 U.S.C. § 523(a)(2)(C) does not extend the "luxury goods or services" limitation to cash advances. Presumably, despite any reading of the legislative history to the contrary, a creditor may invoke the presumption even if the cash advances are for necessities. A debtor's utilization of cash advances nevertheless is relevant and material in determining whether a debtor has rebutted the presumption of nondischargeability.

the Casino for approximately a year. The record does not reveal any specific details about those earlier advances, meaning the remaining factors carry little weight by comparison.

(9) The Defendant obtained seventeen cash advances within 23 days.

(10) There were multiple advances on most, if not all, of the trips to the Casino.

(11) Single cash advances ranged from $100.00 to $1,039.99.

(12) The cash advances exceeded the credit limit on May 14, 1999.[15]

(13) The record does not reveal whether the Casino had any dollar limits under which it would forego checking a patron's credit with the credit issuer.

Finally, the Defendant's testimony was credible throughout the direct, cross and redirect examinations. Any inconsistencies between her verbal statements and the documentary evidence, including the Schedules and Statement of Financial Affairs, were at best minimal or inconsequential. Her demeanor during questioning was consistent with one who is simply trying to understand what is being asked and to answer as completely and accurately as possible. It was readily apparent that recounting what had happened to her grandson made the experience of testifying difficult. The Court does not doubt that the Defendant took her oath as a witness seriously.

■■■ As for assessing the costs of this adversary proceeding, 11 U.S.C. § 523(d) provides:

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor

was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d). The combination of the following factors made the Plaintiff's commencement and pursuit of this adversary proceeding substantially justified:

(1) All of the cash advances fell within the section 523(a)(2)(C) presumption.

(2) All of the cash advances were related to gambling.

(3) The Defendant did not file an answer.

(4) Though the Defendant's January 28, 1998 Answers to Interrogatories provided some detail about the change in circumstances that led to the Debtors seeking relief under Chapter 7, those specific facts do not appear in either the Statement of Undisputed Facts or the Statement of Disputed Facts contained in the April 14, 1998 Joint Final Pretrial Statement and Order. Nor do the Answers appear in the Potential Exhibits section of that document. The Plaintiff, not the Defendant, offered the Answers into evidence at the time of the trial.

(5) Plaintiff's counsel filed a trial brief setting forth her theory of the case. Defendant's counsel did not file a trial brief.

## CONCLUSION

WHEREFORE, the Court finds:

(1) Plaintiff met its burden of establishing the 11 U.S.C. § 523(a)(2)(C) presumption of nondischargeability;

(2) Defendant met her burden of rebutting the presumption and did so with clear and convincing evidence supporting her statement of honest intent; and therefore,

(3) The debt in issue is covered by the General Discharge of Debt entered in the Chapter 7 case on September 23, 1997.

---

15. The 12 comchecks and 6 other Casino charges in issue totaled $6,744.88. *See supra* note 4. The debtor exceeded the $6,000.00 credit limit on May 14, 1997 when she obtained three cash advances totaling $1,145.97.

(4) The Plaintiff was substantially justified in commencing and pursuing this adversary proceeding; and therefore,

(5) The Defendant is not entitled to a section 523(d) judgment for costs.

A separate Order dismissing this adversary proceeding and denying a judgment for costs shall be entered accordingly.